IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | Case No. 11-40345-tmb7 |
| | ) | |
| Jens Peter Soballe, | ) | Portland, Oregon |
| | ) | September 8, 2016 |
| Debtor. | ) | |
| | ) | Final Hearing on Motion |
| _____) | | For Contempt |

**TRANSCRIPT OF PROCEEDINGS**

Before the Honorable Trish M. Brown

United States Bankruptcy Judge

Appearances of Counsel:

For Debtor                    Michael Fuller
                              OlsenDaines PC
                              US Bancorp Tower 31st Fl
                              111 SW 5th Ave Ste 3150
                              Portland OR  97204

                              Kelly Donovan Jones
                              Law Office of Kelly D Jones
                              819 SE Morrison St Ste 255
                              Portland OR  97214

For Creditor PSU              Jeanne Kallage Sinnott
                              Miller Nash Graham & Dunn
                              111 SW 5th Ave Ste 3400
                              Portland OR  97204

**Transcribed From Electronic Recording By:**
*Robyn M. Anderson, Transcriber*
*3351 SW Redfern place*
*Gresham, Oregon  97080 (503) 618-9938 email: robyntype@gmail.com*

# GENERAL INDEX

**Proceedings of September 8, 2016**........................1

Motion for Contempt......................................2

Creditor's PSU Opening Statement........................15

Debtor's Opening Statement..............................19

**Shari Powell (PSU):**
Direct Examination by Ms. Sinnott.......................21
Cross-Examination by Mr. Jones..........................32
Redirect Examination by Ms. Sinnott.....................48

**Nicole DuPont (PSU):**
Direct Examination by Ms. Sinnott.......................51
Cross-Examination by Mr. Jones..........................61
Redirect Examination by Ms. Sinnott.....................73

**Megan Looney (PSU):**
Direct Examination by Ms. Sinnott.......................74
Cross-Examination by Mr. Jones..........................85

**Jens Peter Soballe (PSU/Debtor):**
Direct Examination by Ms. Sinnott......................102
Direct Examination by Mr. Fuller.......................106
Cross-Examination by Ms. Sinnott.......................111

Creditor's PSU Closing Argument........................114

Debtor's Closing Argument..............................122

## EXHIBITS

(Creditor PSU's exhibits: B, F, G, H, I, J, K, L and M)..7

(Creditor PSU's exhibits: C, D and E)...................32

(Debtor's exhibits: 1, 2, 3, 5, 16, 26, 27 and 28).......8

1                                              **September 8, 2016**

2                                                 **9:05:30 a.m.**

3                                                 **(Judge Brown)**

4                    **P R O C E E D I N G S**

5            THE COURT:  Good morning.

6            MR. FULLER:  Good morning.

7            THE COURT:  This is the time set for a final

8    hearing on a motion for contempt as to Portland State

9    University, except for the issue today is, we're not going

10   to decide the contempt, it's only whether or not it's a

11   student loan.

12           But what I would like you to consider, and if we

13   need to take a break after we have your evidence so that

14   you can think about this, I would like you to consider

15   putting on whatever evidence you can with the live

16   evidence on the contempt issue today.  And then I know I'm

17   not deciding that issue, but then -- and I'm not

18   indicating one way or the other how I'm going to rule --

19   but that way, then you can supplement with affidavits and

20   we don't have to have yet another trial, should that be

21   necessary.

22           So, I'm certainly willing to, you know, take a

23   break and have you -- not right now, but does that make

24   sense to everyone?  I really do not want to have two

25   evidentiary hearings if that is necessary.

1      MS. SINNOTT:  Your Honor, I see that Mr. Soballe

2 is not in the courtroom.

3      MR. FULLER:  He's on 3rd and Alder.

4      MS. SINNOTT:  Oh, okay.  So, I guess my concern

5 would be if he was not here, we wouldn't be able to ask

6 him questions about what his damages have been.

7      THE COURT:  Well, he's -- he's coming though,

8 right?

9      MR. FULLER:  Absolutely, Your Honor.

10      THE COURT:  Okay.

11      MS. SINNOTT:  One concern I have about that is

12 when we -- when I deposed Mr. Soballe, I was going to ask

13 questions about his damages, and Mr. Fuller -- Fuller

14 objected to that line of questioning because this hearing

15 was limited to the dischargeability.  So I have not had an

16 opportunity to question him about that.

17      THE COURT:  Okay, well never mind then.  I was

18 trying to -- trying to, you know, make things so that, to

19 the extent we could -- and really, you shouldn't have

20 objected.  It's all one -- you have a motion for contempt,

21 she should have been able to ask whatever questions she

22 wanted to ask.

23      MR. FULLER:  I agree, Your Honor.

24      THE COURT:  Next time, do not do that.

25      MR. FULLER:  I will not.  It was only in an

1  effort to reduce costs, and we did not get into their

2  knowledge of the discharge order, which would have taken a

3  lot more expense and time during depositions and

4  discovery.

5           THE COURT:  Okay.

6           MS. SINNOTT:  I think that we've admitted that

7  PSU knew about the discharge order.

8           THE COURT:  Right.

9           MS. SINNOTT:  That's not an issue for us.

10          THE COURT:  Okay.  All right.  So then I have

11 some other preliminary issues.

12          This is for PSU.  In the initial letter, the

13 school claimed that the debt was nondischargeable under

14 section 523(a)(8)(B).  But in your trial brief, you argue

15 nondischargeability under 523(a)(8)(A)(i).  So I want you

16 to clarify if you've abandoned the 523(a)(8)(B).

17          MS. SINNOTT:  We are, for this proceeding,

18 operating under the understanding that the discharge --

19 nondischargeability provision was (a)(8)(A)(i).

20          THE COURT:  (i), okay.  All right.

21          And for you, you have suggested that there were

22 different versions of the contract.

23          If you intend to pursue that argument during

24 this hearing, please focus on quickly summarizing any

25 substantive differences between the various versions.  The

1  alleged contract isn't governed by the statute of frauds,

2  and the Court hasn't been able to find any requirement for

3  one integrated written document.

4        The fact that PSU -- PSU has two slightly

5  different versions does not appear to be particularly

6  relevant unless the material terms are different.

7        And so, just letting you know, I looked at them,

8  I couldn't see any material differences.  But that's not

9  to say I didn't miss it.  All right?

10       So, and generally, Mr. Soballe's alleged consent

11  to the Revolving Charge Account Agreement, PSU has stated

12  that Mr. Soballe affirmatively consented to the agreement

13  in October 2009, in March and July of 2010.  And I hope

14  that you can provide detailed evidence backing up those

15  allegations.

16       And if PSU provides such evidence, then the

17  Debtor needs to explain why such consent was not

18  sufficient to make the agreement applicable to the tuition

19  incurred for the fall 2010 semester.

20       And finally, labels used by the parties to the

21  contract are not dispositive of what constitutes a

22  nondischargeable debt.

23       Accordingly, even if PSU can prove the Debtor

24  assented to the agreement, it still must prove that the

25  debt at issue is a student loan for purposes of section

1  523(a)(8).

2        At the same time, the terms of the contract are

3  informative, although not conclusive, and nothing in the

4  contract purports to weigh the Debtor's ability to argue

5  that the debt is dischargeable.  In fact, that's why we're

6  here today.

7        So, if there is an enforceable contract, I'm not

8  inclined to hold that it has an invalid pre-petition

9  bankruptcy waiver.  All right?

10        So -- just so people are sort of clear about

11  where I am.

12        So, with that said, do the parties want to do

13  opening?

14        MR. FULLER:  We have just two preliminary

15  matters, Your Honor.

16        THE COURT:  Okay, and what are we going to do --

17  where is your client?

18        MR. FULLER:  He is stuck in traffic, and I

19  assure you he will be here by the time he is called.

20        THE COURT:  Okay.

21        MR. FULLER:  And I apologize for his tardiness.

22        First, we'd like to stipulate as to authenticity

23  as to all the documents, except for the two versions of

24  the agreement, and -- and PSU Exhibits C, D and E.

25        THE COURT:  So A, B, F through M can be

1  admitted?

2       MR. JONES:  Well, A is -- Your Honor, A is the

3  one version --

4       THE COURT:  Well, I just was listening to him.

5  So he said C, D and E.

6       MR. JONES:  Yeah, C, D and E.

7       MR. FULLER:  So with the -- also with the

8  exclusion of PSU Exhibit A, which is Debtor Exhibit 1.

9  And then Debtor Exhibit 16, which I hope --

10      THE COURT:  Well, can we -- go back.  What ones

11  of theirs do you agree can come in?

12      (Pause)

13      THE COURT:  While he's doing that, do you --

14  have you seen his exhibits?

15      MS. SINNOTT:  I have seen them, and I don't have

16  any objections to their authenticity.

17      THE COURT:  So it looks like he has 1, 2, 3, no

18  4, -- 5, and 16?

19      MR. FULLER:  And we would not object to Exhibits

20  -- I'll just tell you the ones that we do object to of

21  Portland State.  A, C, D and E.

22      THE COURT:  So B, F, G, H, I, J, K, L, M are

23  admitted.

24      (Creditor PSU's exhibits B, F, G, H, I, J, K, L

25  and M were then received into evidence)

1          THE COURT:  And you have, what?

2          MR. JONES:  He's got three outside of the

3  binder.

4          THE COURT:  I see.  You have 1, 2, 3, 5, 16, 26,

5  27 and 28.

6          MR. FULLER:  Correct, Your Honor.

7          THE COURT:  That's kind of a bizarre numbering

8  system.

9          MR. FULLER:  I know, we just used the numbers

10  that we had used at the deposition for --

11          THE COURT:  Okay.

12          MR. FULLER:  Sorry.

13          THE COURT:  And you have no objection to those.

14          MS. SINNOTT:  I have no objection to the

15  authenticity of those documents.

16          THE COURT:  Okay.  You -- you can object to

17  relevance or whatever.

18          (Debtor's exhibits 1, 2, 3, 5, 16, 26, 27 and 28

19  were then received into evidence)

20          MS. SINNOTT:  Yes.

21          THE COURT:  Right.  Right.

22          MR. FULLER:  And, Your Honor, we had stipulated,

23  may it please the Court, that Portland State will call its

24  witnesses first.  We will be allowed to cross-examine them

25  as -- as if on direct, so the witnesses can be excused, so

1    we don't have to recall them in our case.

2                  THE COURT:  That's fine.

3                  MR. FULLER:  And we are going to object to the

4    testimony of this witness, Ms. Powell.  We can do that

5    now, or however Your Honor prefers, but prior to her

6    testimony.

7                  MS. SINNOTT:  I'd rather just address that now -

8    -

9                  THE COURT:  That's fine.

10                 MS. SINNOTT:  -- if you don't mind.

11                 THE COURT:  Who -- who is it, and what's the --

12                 MS. SINNOTT:  Your Honor -- Your Honor, Ms.

13   Powell is the IT person from Portland State who we intend

14   to call to authenticate the electronic agree -- to Mr.

15   Soballe's electronic acceptance of the terms and

16   conditions of the Revolving Credit Account Agreement.  And

17   that's -- I guess I'll let Mr. Fuller argue as to why he

18   objects to her testimony, and respond.

19                 MR. FULLER:  Your Honor, we served request for

20   production marked as Exhibit 29, and the first six

21   requests were for documents identifying the witnesses who

22   might have personal knowledge or who might testify today.

23   And Portland State's response was that they had produced

24   documents that identify those potential witnesses.

25                 During the deposition, the first 30(b)(6)

1  deposition, we asked specifically if these requests were

2  reviewed, and we were told they were.

3         Throughout the first deposition and the

4  continued 30(b)(6) deposition of Ms. Looney, we asked for

5  the witnesses that might have knowledge about the

6  authentication of these agreements, because it's so

7  important to our case, and we were told that there was no

8  one else.

9         The first time we ever saw Ms. Powell's name was

10  when the witness list was filed.  We know nothing about

11  her or her testimony.  And we would ask her to be

12  excluded, because we were very clear, and I can point you

13  to the parts of the transcript where we wanted to know

14  everyone who was going to be here so we could ask them

15  about the authentication and the assent issues.  And we

16  were never -- you know, these were ongoing -- these stated

17  they were ongoing, and we never got anything, a phone call

18  or an email or anything, so that we could have deposed

19  them before today.

20         MS. SINNOTT:  Your Honor, we produced witnesses

21  for the 30(b)(6) depositions, and in good faith we

22  produced who we thought the Debtor's counsel needed to

23  depose.

24         During the course of discovery, and very

25  recently, it has come to our attention through arguments

1  from counsel that Mr. Soballe never agreed to this RCAP.

2  We didn't know that that was going to be an issue in this

3  case.  He -- in the motion for contempt, he specifically

4  said, "This is my agreement with PSU."  He attached it to

5  his declaration.  We proceed -- we produced that agreement

6  in discovery.  We produced the witness who produced -- who

7  provided that agreement to Mr. Soballe.

8          It only came out during the course of this

9  proceeding that Mr. Soballe was now claiming, "Oh, I -- I

10  never signed that."

11          So PSU would now be prejudiced if it could not

12  call a witness to authenticate that he did actually sign -

13  - or agree to this RCAP through his online student

14  account.  And I don't know what prejudice Mr. Soballe

15  would suffer if we couldn't -- if we did put this witness

16  on.

17          MR. FULLER:  This could --

18          MS. SINNOTT:  Also -- I actually want to note

19  one more thing.

20          So, the last deposition was I believe August

21  29th.  No, August 18th.

22          During -- at the end of that deposition, Mr.

23  Jones said, "I want to keep this deposition open again."

24  We had already provided two witnesses to answer their

25  questions.  We said, "You know, if you -- we're not going

1  to agree to that.  If you want to have another 30(b)(6)

2  deposition, you can take it up with the Court."  They

3  never filed a motion to compel, they never contacted the

4  Court, we never had a conference about it.  Just now

5  they're -- they're arguing that we shouldn't be able to

6  present this witness.  I don't think that they preserved

7  their ability to argue that at this point.

8          MR. FULLER:  One thing, Your Honor.  We had an

9  initial deposition of both parties.  At that deposition,

10  Mr. Soballe said in no uncertain terms that he didn't

11  recall ever seeing that agreement before it was emailed to

12  him in 2013.  They were aware of that fact at that point.

13  We did a follow-up deposition, and if you would turn to

14  page 141 of Ms. Looney's deposition transcript, and I'll

15  just let Your Honor read from lines 7 to 14, and we'd rest

16  on that argument.  If the witness is able to testify, we'd

17  ask that this Court consider the weight given to her

18  testimony, considering we specifically asked if anyone

19  would have more information about the authentication of

20  these documents, and they said they didn't know.

21          MS. SINNOTT:  Your Honor, Ms. Looney is from

22  Student Financial Services.  During the first deposition

23  of Nicolle DuPont, who is from the Registrar's Office, who

24  was the witness that we put on to describe why Mr. Soballe

25  could have dropped his classes even though he claims he

1   couldn't, because that's what we thought the issue was in

2   the beginning.

3          During that deposition, Mr. Jones went through

4   excruciating detail in the account statement, which is

5   Exhibit -- I believe it's our last exhibit.  But it's --

6   it's a very dense document that has a bunch of entries

7   about credits and debits, and what are these codes, and

8   what have you.  And that seemed to be the -- the issue

9   that Debtor's counsel really wanted to get at.  So we

10  produced Ms. Looney, who knows the specifics about that.

11         And then only later did it come out that Mr.

12  Soballe's saying he never agreed to this agreement.  So

13  now we need to find an IT person to show that when he

14  clicked the box, we could prove that he agreed.

15         THE COURT:  Okay, hang on a second.

16         (Pause)

17         THE COURT:  Well, your motion for contempt says

18  he registered for 2010 fall classes.

19         MR. FULLER:  And he did, Your Honor.

20         What the evidence is going to show is that he

21  was unaware of any agreement between him and Portland

22  State, and when he asked for it, they emailed him an

23  agreement in 2013.  But he doesn't ever recall having seen

24  it.

25         THE COURT:  Oh, okay.  I'm going to allow the

1  testimony.

2           MR. FULLER:  Okay.

3           MS. SINNOTT:  Thank you.

4           THE COURT:  You -- you said he registered for

5  classes.  What he knew or didn't know, that's another

6  thing altogether.  But he registered for classes.  And

7  what did he do when he did that?  And I'm going to allow

8  the testimony.

9           And whether or not you could take a deposition

10 of the per -- the IT person really, I'm not going to find

11 that there would be much information in a deposition of

12 the IT person.  So --

13          MR. FULLER:  Yes, Judge.

14          THE COURT:  -- all right?  So, okay.  So now do

15 you want to do opening or not?

16          MS. SINNOTT:  Your Honor, I would like to do a

17 short opening, if you don't mind.

18          THE COURT:  Okay.  Well, it's his motion, so he

19 should go first, if you want to do opening.

20          MR. FULLER:  Go first.

21          MS. SINNOTT:  I think they wanted me to go first

22 for --

23          MR. FULLER:  The parties seem to agree that

24 Portland State had the burden, and so if we want to --

25          THE COURT:  Whatever.  Fine.

1    MR. FULLER:  Okay.

2    MS. SINNOTT:  Okay.  Thank you, Your Honor.

3

4    **CREDITOR PSU'S OPENING STATEMENT**

5    MS. SINNOTT:  Your Honor, from my trial brief,

6    what I see here is that there are three issues for trial.

7    And I want to just kind of outline what the evidence is

8    going to show for those three issues.

9    So the first --

10   THE COURT:  Hang on a minute.

11   MS. SINNOTT:  I'm sorry.

12   THE COURT:  Can you -- maybe you should remain

13   seated and --

14   THE CLERK:  Move the microphone.

15   THE COURT:  -- pull the microphone in.

16   MS. SINNOTT:  Okay.  Sorry.  Is that better?

17   THE COURT:  Way better.

18   MS. SINNOTT:  Oh, wow.  Okay, so, as I was

19   saying, there are three issues for trial here.

20   The first one, as I see it, is whether Debtor

21   owed anything to PSU.

22   Debtor alleges that he was not able to drop his

23   classes due to an online hold.  And the only fact that

24   this could be relative to is whether he owes anything to

25   PSU.  If he wasn't allowed to drop, and he should have

1   been allowed to drop. And I guess what he's arguing is

2   that he doesn't owe anything.

3         But the evidence will show -- well, first of

4   all, he already admitted that he owed an obligation. His

5   motion for contempt admits that he owes a debt. His

6   schedules admit that he owes a debt. So, we think that

7   alone shows that he owes the debt. Or at least did at the

8   time of his bankruptcy petition.

9         But additionally, the evidence will show that

10  Debtor's hold was not placed until October 20th, 2010.

11  That was well after the drop deadline. If Debtor was in

12  Haiti, as he says in his motion, until October 24th, then

13  he wouldn't have been able to drop before the deadline

14  anyway.

15        The second thing is the evidence will show that

16  Debtor -- if Debtor was having trouble dropping online, if

17  there was in fact a hold on his account before the

18  semester began and before the drop deadlines expired, he

19  could have easily gone to the Registrar's Office, he could

20  have called, he could have emailed, and he could have

21  dropped his classes. The online hold does not preclude a

22  student from dropping their classes. It just precludes a

23  student from dropping their classes online.

24        The evidence will show that Debtor did none of

25  those things.

1    The evidence will also show that Debtor could

2    have retroactively obtained a refund of these amounts, up

3    to a year later, by filing two separate petitions.  The

4    evidence will show that Debtor did none of those things.

5    So we think the evidence will show that Debtor

6    did owe PSU for this unpaid tuition.

7    The second issue is whether the obligation is

8    governed by the RCAP.  And that's the Revolving Credit

9    Account Agreement.  The "P" is for policy, the -- it's

10   Revolving Credit Account Agreement Policy.

11   The Debtor alleges, although he did sign a

12   declaration attaching the RCAP as an exhibit, claiming

13   that that was his agreement with PSU at the beginning of

14   this proceeding, he now alleges that he does not remember

15   agreeing to this RCAP.

16   However, the evidence will show that Debtor

17   agreed to the RCAP on numerous occasions, beginning as

18   early as 2005.

19   In 2010, before he registered -- before he was

20   permitted to register for his classes for fall 2010, he

21   was required to "click the box" of the terms and

22   conditions which had the RCAP as a hyperlink.  He was not

23   permitted to register without doing that.

24   Debtor was also required to accept -- the

25   evidence will show that Debtor was also required to accept

1  the RCAP before doing such things as changing his online

2  password.  The evidence will show he changed his online

3  password on July 22nd before he registered for classes.

4         Debtor also cannot offer evidence -- any

5  evidence that he did not register for RCAP.

6         The evidence will show that when I asked Debtor

7  during his deposition whether it was possible that he had

8  agreed to the RCAP, he said it was possible.

9         The third issue, and this is the issue that I

10 think is really the meat of this proceeding, is whether

11 the RCAP is an educational loan under 523(a)(8)(A)(i).

12 The Debtor alleges that the RCAP is not an educational

13 loan, because he never attended classes, and therefore

14 never received a benefit.

15        However, the evidence will show, first, PSU is a

16 government unit.  That's one of the prerequisites for

17 meeting the requirements of 523(a)(8)(A)(i).

18        The evidence will also show the RCAP is a loan.

19 It has deferred payments, it's an extension of credit,

20 there are due dates, there are interest charges for past

21 due payments, the Debtor would incur late fees by not

22 paying on time, and collection fees.

23        In sum, Your Honor, the evidence will show these

24 three issues in favor of PSU.

25        THE COURT:  All right.

1          MR. JONES:  Your Honor, just a short opening for

2     Debtor.  Permission to stay seated.

3          THE COURT:  Permission granted.

4

5                    **DEBTOR'S OPENING STATEMENT**

6          MR. JONES:  So, as Debtor sees this, the -- the

7     -- really the only issue here is whether this deferred

8     tuition debt was dischargeable or nondischargeable under

9     523(a)(8).

10         In order for it to be so, it must be considered

11    a loan.

12         In the Ninth Circuit, the definition of "loan"

13    has been extended to include certain tuition debts that

14    are governed by a valid agreement that sets forth the

15    terms and conditions of the repayment, and including a

16    date certain for repayment, and (3) whether there's an

17    actual benefit received by the Debtor resulting in the

18    debt.

19         So the two sub-issues here to determine whether

20    this was a loan is, again, is there a valid and

21    enforceable agreement pertaining to the 2000 tuition

22    debt, and did Mr. Soballe receive an actual benefit from

23    that tuition debt?

24         THE COURT:  Okay.

25         MR. JONES:  And I guess one more thing.

1          In -- in terms of arguing whether a debt was

2   actually owed, Debtor concedes that there is a debt owed

3   here.  We're -- we're not setting forth that there was

4   not a debt owed, just whether that debt is a loan under

5   523(a)(8).

6          THE COURT:  Okay.

7          MR. JONES:  And we also concede that they're --

8   PSU is a governmental unit, for whatever that's worth.

9          THE COURT:  Okay.  Was that not in your

10  stipulated facts?  Things like that should have been

11  there.

12         MS. SINNOTT:  It should have been.

13         MR. JONES:  It should have been.

14         MR. FULLER:  Ms. Sinnott forgot it.

15         MS. SINNOTT:  That's my bad.

16         THE COURT:  Okay.  Not casting blame, just

17  saying that probably should have been in the stipulated

18  facts.  Okay.  Call your first witness.

19         MS. SINNOTT:  Thank you.  Your Honor, I'd like

20  to call Shari Powell.

21         THE COURT:  All right.

22         MS. SINNOTT:  And, Your Honor, I have a visual

23  aid I'm not intending to admit as an exhibit, and I've

24  given it to Debtor's counsel.  Do you mind, may I

25  approach?

1      THE COURT:  You may.  Thank you.

2

3                    **SHARI POWELL**

4  called as a witness by the Creditor PSU, having being

5  first duly sworn, was examined and testified as follows:

6      THE COURT:  Please state your full name and

7  spell your last name for the record.

8      THE WITNESS:  Shari Powell, P-o-w-e-l-l.

9      THE COURT:  All right.  Okay, thank you, you

10 may be seated.

11                **DIRECT EXAMINATION**

12 BY MS. SINNOTT:

13     Q    Good morning, Ms. Powell.

14     A    Good morning.

15     Q    Ms. Powell, where do you work?

16     A    Portland State University.

17     Q    And what is your title at Portland State

18 University?

19     A    I'm the Associate Director of ERP in the

20 Information Solutions Team.

21     Q    And what does ERP stand for?

22     A    Enterprise Resource Planning.

23     Q    What are your responsibilities as Associate

24 Director of ERP?

25     A    Well, I manage a team of twelve analyst

1 programmers, and we're responsible for supporting and

2 maintaining the administrative computing systems of

3 Portland State.

4     Q    And does that include maintaining student

5 records?

6     A    Yes.

7     Q    And how long have you been responsible for

8 maintaining student records at PSU?

9     A    22 years.

10     Q    So it's safe to say you're generally familiar

11 with the procedures for maintaining student records?

12     A    Yes.

13     Q    And the security of maintaining student

14 records?

15     A    Yes.

16     Q    Can you tell me how records are electronically

17 stored at PSU?

18     MS. SINNOTT:  And this is where the visual aid

19 will come in handy.

20     THE COURT:  All right.

21     A    Okay, we have three Oracle databases.  And so

22 on this picture, the blue box is OAM, that's Odin Account

23 Manager.  And that's where the general student computer

24 accounts, and faculty and staff, as well, are stored.

25     The second one, the green box, that's the

1   Banner Information System.  That stores data on student

2   registration, accounts receivable, and other

3   administrative records like that.

4         Oh, and the word "Banweb", Banweb is the web

5   interface into the Banner records, so where you would go

6   to register for classes, say.

7         The third Oracle database is the pink box, the

8   data warehouse.  And every day, we take data from OAM and

9   from Banner and it's fed to the data warehouse.  It's a

10   query-only, read-only database, and that's where the

11   campus does their reporting from.

12     Q    And so would this data warehouse be secure?

13     A    Yes.

14     Q    And can you explain to me how it's secure?

15     A    In order to log into it, you need a user

16   ID/password, and you have to have been granted access to

17   see certain parts of the data.

18     Q    Okay.  So it wouldn't -- somebody from the

19   street couldn't just log in and change the data for -- at

20   the data warehouse.

21     A    Correct.

22     Q    So, as I'm sure you're aware, this case

23   involves a controversy over fall 2010 registration.  And

24   one of the issues is whether the Debtor, Mr. Soballe,

25   agreed to PSU's RCAP before he registered for fall 2010.

1  So I'm going to ask you a couple questions about that.

2  So could you please turn to Exhibits C and D?  And you

3  can take as long as you need.

4      A    Yes.

5      Q    Do you recognize these documents?

6      A    Yes.

7      Q    And -- and what are they?

8      A    So, Exhibit C is the Banweb page that you would

9  go to.  So first you would log in with your user

10 ID/password.

11         And then once per term, you would be presented

12 with this page.  And you would have to click "accept".

13 So the word "accept" is in the middle on the bottom.

14 It's a -- it's a button.  You click "accept", and then

15 you would be navigated to the registration page, where

16 you could register for classes.

17     Q    Okay, great.  So would a student have to click

18 "accept" before being allowed to navigate to the

19 registration page for each term?

20     A    Correct.

21     Q    Okay.  And can you just read for me -- well,

22 first let's look at the top where it says "here", it's in

23 blue.

24     A    Mm hm.

25     Q    What -- why is that in blue?

1    A    So that's a hyperlink, and you click on it, and

2 it presents to you Exhibit D.

3    Q    Okay.

4    A    Which is the Revolving Charge Account

5 Agreement.

6    Q    Okay.

7         THE COURT:  Wait, wait, wait.  What are you

8 looking at?

9         THE WITNESS:  So on Exhibit C --

10         THE COURT:  Yeah.

11         THE WITNESS:  -- that first sentence under the

12 green line, there's a "click here for the details".

13         THE COURT:  Oh, all right.

14         THE WITNESS:  The "here" is in blue.

15         THE COURT:  All right, yeah.  Yeah.  I just --

16         THE WITNESS:  Okay, so you click there.

17         THE COURT:  -- I didn't see it, so okay.

18    Q    (by Ms. Sinnott)  And then --

19    A    And -- mm hm.

20    Q    Oh, I'm sorry.

21    A    No, I'm done.

22    Q    And can you just read for me under the "I

23 accept PSU terms and conditions," the first bullet there?

24    A    You're on Exhibit C?

25    Q    Yes.

1       A     So, item one?

2       Q     Mm hm.

3       A     "The following page outlines the terms and

4    conditions currently applicable to this agreement.

5             "These terms and conditions can also be found

6    in OAR 577-072-0020."

7       Q     Okay.  And then can you also read number four?

8       A     "All debts incurred pursuant to the Revolving

9    Charge Account Plan are for the purpose of furthering my

10   education at Portland State University where I am

11   enrolled in classes and/or approved for enrollment."

12      Q     Thank you.  Can you please turn to Exhibit B?

13   Do you recognize this document?

14      A     Yes.

15      Q     And can you just explain generally what this

16   is?

17      A     So, this is the audit trail from the OAM

18   system.  So that was the blue box in this picture, Odin

19   Account Manager.  And these records, this is the student

20   ID, PSU ID, of Mr. Soballe.

21      Q     Okay.  And did you access this record through

22   the data warehouse?

23      A     Yes.

24      Q     And so if you look down at the second line --

25   and actually, let's just explain for the Court, so where

1  it says "term", can you explain what these numbers mean?

2  So 2010-03 and then 2010-04?

3       A    You're on another exhibit.

4            THE COURT:  What exhibit are you on?

5            MS. SINNOTT:  On Exhibit B.

6            THE WITNESS:  Okay.

7            MS. SINNOTT:  Right next to the ID numbers.

8            THE COURT:  Okay.

9            MR. FULLER:  Exhibit B?

10           THE WITNESS:  So sorry, I thought we were on A.

11  We're on B?

12           THE COURT:  No, you did ask her about A.

13           MS. SINNOTT:  Oh, I'm sorry, B.

14           THE WITNESS:  B, okay.

15           MS. SINNOTT:  B, I must not have --

16           THE WITNESS:  Oh, so I misunderstood.

17           MS. SINNOTT:  Yes.

18      A    B.  So, okay, I was describing A.

19           B is the registration data for Mr. Soballe.

20      Q    (by Ms. Sinnott)  Okay.  And it looks like we

21  have the same ID number there, so that's Mr. Soballe's ID

22  number?

23      A    Correct.

24      Q    Okay.  So now I'll ask, the term?

25      A    Yes, the term.

1    Q    Okay, can you just sort of explain, what are

2    these numbers, 2010-03 and 2010-04?

3    A    So, the first four numbers are the year, and

4    then 03 is summer.  So 01 is winter, 02 is spring, 03 is

5    summer, 04 is fall.

6    Q    Okay.  So, on the second line there, would that

7    have been fall 2010?

8    A    Correct.

9    Q    Okay, great.  And so it looks like here,

10   registration date is July 3 -- the first one is July

11   30th, 2010?  Do you see that?

12   A    Yes.

13   Q    Would Mr. Soballe have been required to "click"

14   -- "click the box" on Exhibit C before being allowed to

15   register on July 30th?

16   A    Yes, because that's the first time that term

17   was -- the term above is from the prior term, so.

18   Q    Okay.

19   A    Mm hm.

20   Q    And just because we were talking about Exhibit

21   E before, I want to make sure we are all on the same page

22   about where this document came from.

23        So, can you describe, did -- where did this

24   document come from?

25   A    So, I log into the Oracle database, I use SQL,

1 it's the Structured Query Language, it's how programmers

2 query Oracle database.

3     Q    Okay.

4     A    And that's how I got it.

5     Q    So now we're going to go to Exhibit E.

6     A    Okay.

7     Q    And let's just start from the beginning, even

8 though you already answered these questions.  Do you

9 recognize this document?

10     A    Yes.

11     Q    And what is it?

12     A    So this is the audit trail from OAM, and OAM is

13 the blue box on this picture, Odin Account Manager.

14     Q    Okay.

15     A    And the audit trail for Mr. Soballe.

16     Q    Okay.  So it looks like there are a bunch of

17 event dates there.  And I'm most concerned with this

18 event date on July 22nd, 2010, do you see that line?

19     A    Yes.

20     Q    And it looks like -- does that -- this is

21 pretty obvious, but I want to make sure we all

22 understand, does that -- did Mr. Soballe change his

23 password on that date?

24     A    Yes.

25     Q    Okay.  And what would Mr. Soballe have been

1   required to do on that date before he could change his

2   password?

3       A    So, anytime you change your password in OAM,

4   you're required to agree to three University policies.

5   One is the Appropriate Use Policy, one is the Electronic

6   Communications Policy, and the third one is RCAP, the

7   Revolving Charge Account Policy.

8       Q    Okay.  So it looks like Mr. Soballe then would

9   have agreed again to the RCAP on July 22nd, 2010, is that

10  correct?

11      A    Correct.

12      Q    One of the issues that the Debtor has raised

13  during the course of this proceeding is that a 2005

14  agreement that was produced to him had two different

15  formats, two different versions.

16          Do you have any idea as to why they would have

17  been produced in two different versions -- or two

18  different formats?

19      A    I believe one of those documents came out of

20  the data warehouse, the pink box on this sheet.  And so

21  the person who wrote the report chose a particular font,

22  and -- and so that's what was displayed on the report.

23          But in the end of the day, it's all zeros and

24  ones, it's the data that matters, and the font is merely

25  part of the presentation.

1    Q    Thank you.

2          MS. SINNOTT:  And I have no further questions.

3          MR. JONES:  Your Honor, at the risk of trying

4    the Court's patience, because Debtor was unable to depose

5    Ms. Powell, we would ask for maybe a five minute recess

6    so we can prepare cross questions?

7          THE COURT:  I'm okay with that.  Just so you

8    know, they're testing the air in the courtroom at noon,

9    so whatever -- however long we go, we do have to break at

10   noon.

11         MR. JONES:  Okay.  And if I could, Your Honor,

12   too, I actually have an adjourned confirmation hearing at

13   1:30 that I can -- if -- if it goes that long, I can pop

14   up to Judge McKittrick's room for -- for five minutes.

15         THE COURT:  Down to Judge McKittrick's, but yes

16   --

17         MR. JONES:  Down.

18         THE COURT:  -- that's fine.  All right, we'll

19   take a five minute recess.

20         MS. SINNOTT:  Thank you.

21         (Recess)

22         THE CLERK:  Please rise.  Court is once again

23   in session, the Honorable Trish M. Brown presiding.

24   Please be seated.

25   //

1    MS. SINNOTT:  Your Honor, I don't want to

2  interrupt the cross exam, but I did realize that I

3  neglected to ask if we could admit those exhibits into

4  evidence.

5         So can I now ask the Court?

6         THE COURT:  B, C, D --

7         MS. SINNOTT:  B, C, D, E.

8         THE COURT:  Well, B is already in.

9         MR. JONES:  No objection.

10         THE COURT:  All right.  B --

11         MS. SINNOTT:  Thank you.

12         THE COURT:  B, C, D and E are admitted.

13         (Creditor PSU's exhibits B, C, D and E were

14  then received into evidence)

15

16              **CROSS EXAMINATION**

17  BY MR. JONES:

18    Q   Hi, Ms. Powell.  Just a few questions for you

19  here.  I'm going to refer you back to PSU Exhibit E there

20  in that binder.

21         And Ms. Powell, it's your testimony that on all

22  these dates that are listed here in Exhibit -- actually,

23  if I said D, I meant Exhibit E -- all these dates that

24  are in Exhibit E then, Mr. Soballe would have went online

25  to the -- to the Banner system, clicked on a box, and

1 then agreed to an RCAP with PSU, is that correct?

2 　　A　　On the 2010 and forward, yes.

3 　　Q　　So it's your testimony that as late as October

4 21st, 2015, that Mr. Soballe was agreeing to a RCAP with

5 PSU?

6 　　A　　Correct.

7 　　Q　　Are you aware that this was many years after

8 Mr. Soballe had attended PSU and registered for classes?

9 　　A　　According to the registration data, yes.

10 　　Q　　Do you know approximately when the last time

11 Mr. Soballe attended classes or registered for classes at

12 PSU?

13 　　A　　Registered, we'd have to look at Exhibit B, I

14 believe.

15 　　Q　　Mm hm.

16 　　A　　Whether he attends classes or not, that's not

17 for me to say.

18 　　Q　　Okay, whether he registered for classes, the

19 last time he registered for classes.  And we can look at

20 Exhibit B, if you'd like.

21 　　A　　Yes, so one can log into Banweb and look at

22 transcripts, do other things.  It's not just register for

23 classes that you would log into Banweb.

24 　　Q　　Right.  But is it your testimony today that, as

25 late as October 21st, 2015, one of the things that Mr.

1  Soballe did when he went online was clicked on a box and

2  agreed to RCAP with PSU?

3      A     Correct.

4      Q     In 2015.

5            THE COURT:  Well, while you're on this, what

6  does "AUP accepted" mean?

7            THE WITNESS:  So, that was the part where you

8  have to agree to three University policies.  The first

9  one is the Appropriate Use Policy, the Electronic

10 Communications Policy, which is now -- in 2010 it was

11 called the Electronic Communications Policy, it's now

12 called the Email Communications Policy.  And then the

13 third one is RCAP.

14           The event code we call AUP, but it includes all

15 three of those agreements.  It's just the text name for

16 having clicked the box.

17           THE COURT:  Okay.

18     Q     (by Mr. Jones)  Ms. Powell, do you have any

19 personal knowledge that Mr. Soballe reviewed the

20 agreement in Exhibit A or B?

21     A     Exhibit B is the registration data.

22     Q     Exhibit -- Exhibit A, then.

23     A     Yes, so --

24     Q     Actually, Exhibit --

25     A     -- so if you're asking why it says "password

1 change" versus "AUP accepted," is that the question on

2 Exhibit E?  I can explain that.

3     Q   No, but you can -- you can explain that if

4 you'd like.

5     A   So, when we had the Lighthouse system, which

6 you see the resource name is Lighthouse, every time you

7 changed your password, you had to agree to all three

8 policies.  And then we decided, well, that was a lot of

9 agreeing to have to do every time you read -- read the

10 policies.  So then we went to OAM 2.0, we switched

11 systems.  And then just every six months you had to

12 agree.

13         So that was the difference there.

14     Q   Okay.  So -- so I -- my question was -- and

15 thank you for that clarification -- was, do you have any

16 personal knowledge that Mr. Soballe viewed any version of

17 an RCAP?

18     A   So, in other words, did he click the "here" --

19     Q   The --

20     A   -- hyperlink?  Did he click the "here"

21 hyperlink?  Is that the question?

22     Q   The question is, do you have any personal

23 knowledge that Mr. Soballe viewed any version of the

24 RCAP?

25     A   Other than the audit trail in Exhibit E, no.

1    Q    And if I could ask you again, on the -- on the

2  audit trail, can you tell me -- well, I think we covered

3  that.

4         So, the audit trail, just -- just to make it

5  clear, is just all those dates and every time that Mr.

6  Soballe would have allegedly went online and clicked on

7  the box, correct?  Correct?

8    A    He clicked "accept", yes.

9         THE COURT:  So, let me ask you this.  When I --

10  I'm trying to understand what happens.

11         When I, for example, go into something and you

12  -- like iTunes, for example, right?  And I get into

13  iTunes, and at some point, you have to -- they -- it pops

14  up and you have to say "I accept", and you have to say

15  you've read it, but of course nobody reads it.  It -- is

16  -- is that -- does the document pop up?  Or you just say

17  "accept"?

18         THE WITNESS:  So what pops up, what popped up

19  in 2010 was Exhibit B.  And then you had to click the

20  "here" to -- to read the details.

21         THE COURT:  Exhibit B?

22         MS. SINNOTT:  Exhibit C.

23         THE WITNESS:  C, sorry, C.

24         THE COURT:  So -- so this pops up.

25         THE WITNESS:  Yes.

1        THE COURT:  And you have to accept.

2        THE WITNESS:  Correct.

3        THE COURT:  And then something else also pops

4    up, right, that's not relevant to this discussion?  The -

5    - the -- something else.  You said there was three things

6    you had to agree to.  Do three different boxes pop up and

7    you have to accept?

8        THE WITNESS:  Three hyperlinks are presented,

9    and then you can click on them to read the details.

10        THE COURT:  But -- but this particular thing,

11    C, would have popped up, the whole thing would have

12    popped up?

13        THE WITNESS:  Just C pops up, and you have to

14    click "here" to get to Exhibit D.

15        THE COURT:  Okay.

16    Q    (by Mr. Jones)  So, Ms. Powell, I guess

17    continuing on with this -- this line of questioning.

18        So, if we look at Exhibit C, as you just

19    testified, this is what pops up.  Do you -- is there any

20    documents or do you have any personal knowledge that Mr.

21    Soballe would have clicked "here" and viewed the RCAP?

22    A    No, I think it's his responsibility to click

23    "here".

24    Q    And I'm going to flip back to Exhibit D.  So

25    Exhibit D is what a student like Mr. Soballe would have

1 seen had they clicked on the hyperlink that said "click

2 here", right?

3     A     Correct.

4     Q     Can you pan down just to the -- to the bottom

5 of the page there on Exhibit B, page 1?

6     A     Yes.

7     Q     Do you see where it says "Return to" and then

8 has Portland State University's --

9     A     Yes.

10     Q     -- address?  So if one were to actually click

11 on the box and look at this blank agreement here, they

12 would also see that it said "Return to Portland State

13 University," correct?

14     A     Yes.

15     Q     Do you know if a completed RCAP was ever

16 returned to Portland State University at that mailing

17 address?

18     A     The only time you would fill this out is if you

19 were standing at the window and you bypass Banweb.  In

20 other words, if you were trying to bypass clicking on

21 "accept" and agreeing electronically, they'd catch you at

22 the window and you'd have to then sign in wet ink.

23     Q     But to be clear, this is the exact copy of what

24 a student like Mr. Soballe would see if they click on the

25 box.  Correct?

1    A    That there's -- yeah, there's two pages.

2    Q    Yeah.

3    A    Yeah.

4    Q    And that -- that agreement would be identical

5    in the sense it would say "Return to Portland State

6    University Business Affairs, BOAR, PO Box 202, Portland,

7    Oregon 97207", correct?

8    A    It says -- okay, what it says above there is,

9    "You may revoke your consent for the use of your SSN by

10   writing to," that's the writing to part.

11   Q    Just that -- I'm just referring to where it

12   says "Return to".

13   A    Mm hm.

14   Q    And in red, in bold and bigger letters at the

15   bottom.

16   A    Yes.

17   Q    Okay.  So if we could -- we have here Exhibit

18   E, and if you'd sort of flip back to Exhibit A.  So on

19   Exhibit A we have what appears to be an e-signed RCAP.

20   Correct?

21   A    Correct.

22   Q    So this is not what Mr. Soballe or a student

23   like Mr. Soballe would see when they clicked on the box,

24   it would be a blank RCAP, correct?

25   A    Correct.

1    Q    Each time, even as late as 2015, you'd be

2 clicking and you'd see a blank agreement.  Not --

3    A    Correct.

4    Q    -- a completed RCAP.

5    A    That's how electronic signatures work.

6    Q    Well, thank you.  Well, you say that's how

7 electronic signatures work, but if there was a completed

8 RCAP in Exhibit A, is there any reason that that wouldn't

9 be attached to online, that a student would actually be

10 viewing the completed RCAP?

11    A    No.  No, this Exhibit A was pulled out of the

12 data warehouse, the pink box.  And that's how we were

13 talking about, you know, the font was chosen by the

14 report writer.

15    Q    Mm hm.  So I'm now going to refer you to, and

16 the Court and opposing counsel, to Debtor's Exhibit 16.

17 I'll give you some time to find that in the binder, and

18 then just let me know when you're there.

19    A    Okay.

20    Q    Give me one second, please.

21        (Pause)

22    Q    And I think if we could kind of do this in

23 tandem, I -- I'll have you also look at Plaintiff's -- or

24 Debtor's, sorry, Exhibit 1.  And so we'll be kind of

25 flipping back from Exhibit 1 and Exhibit 16.  And we'll -

1   - we'll start out with Exhibit 1, Ms. Powell.  And we're

2   specifically going to be looking at pages -- several

3   pages in Exhibit 1.  And we're going to be going to what

4   looks to be an actual, the RCAP.  See that?

5        A    Exhibit 1?

6        Q    Yeah, the RCAP in Exhibit 1.

7        A    Yes.

8        Q    And we'll take a look at page 1 of that RCAP in

9   Exhibit 1, and then we'll flip to page 1 of Exhibit 16.

10  You talked about the different fonts that may vary

11  between versions of an RCAP.  Can you explain any other

12  discrepancies that there is between Exhibit 16 and

13  Exhibit 1, the RCAPs in both of those?

14       A    You want me to review it right now, you mean?

15       Q    If you can.

16       A    Can I take out one piece of paper out of the

17  binder and so I can look at them side-by-side?

18       Q    Sure.  Maybe as long as you put them back

19  afterwards.

20            (Pause)

21            THE COURT:  Is there a difference in the

22  wording?

23            MR. JONES:  Your Honor, I think -- if I

24  understand correctly, when we -- before we did openings,

25  what you're concerned about is possibly any what you call

1  substantive difference between the agreements in the

2  material terms and conditions.

3          THE COURT:  Right.

4          MR. JONES:  Right?  Debtor's argument would be

5  that it's PSU's burden here to show that there was a

6  formation of an agreement, that Mr. Soballe assented to

7  the agreement.  They are producing one e-signed document

8  from 2005, although they're now saying that he entered

9  into an RCAP, or this RCAP, or multiple RCAPs throughout

10 his time at PSU, but they're only producing one from 2005

11 that shows that he clicked on this box and his e-

12 signature was generated.

13         I think that the differences, whether

14 substantive or, you know, different formats, or different

15 words, or different language, goes to whether this actual

16 agreement was assented to.  Goes to its authenticity.  If

17 there's different wording, if there's different language,

18 there's different formats, there's different dates.

19         THE COURT:  Is -- I am asking you, is there any

20 difference in the language between Exhibit 1 and Exhibit

21 16?

22         MR. JONES:  There's --

23         THE COURT:  I see there's like his address is

24 in one and it's not in the other one, I see that the

25 footer is different.  What I want to know is, is the

1  language in the agreement any different?

2      MR. JONES:  The language regarding the -- if I

3  testify to that, the -- the language regarding the terms

4  and conditions is the same.

5      THE COURT:  Well --

6      MR. JONES:  But there are substantive

7  difference in the versions.

8      THE COURT:  -- so it sounds like you're asking

9  her to compare these two agreements, right?

10      MR. JONES:  Yes.

11      THE COURT:  If there are differences, ask her,

12  "Isn't this different?"

13      MR. JONES:  I can do that.  I will.

14      THE COURT:  Really?  I mean, this isn't

15  supposed to be a "gotcha".  Right?  Ask her.

16      MR. JONES:  Okay.

17      Q    (by Mr. Jones)  Ms. Powell, is the form -- date

18  format different between Exhibit 1 and Exhibit 16?

19      A    Yes.

20      Q    Is there a missing digit between -- in the time

21  of acceptance between Exhibit 1 and Exhibit 16?

22      A    Hm, there is.

23      Q    In the bottom in the footer, is the -- is the

24  footer, where it says "Portland State University", is

25  that different between 1 and 16?

1     A     Yes.  The -- the date, you mean?

2     Q     No, the -- the footer, the actual footer where

3  it says "Portland State University, Accounts Receivable,

4  RCAP", one has a date --

5     A     Right.

6     Q     -- one doesn't have a date.

7     A     The date, mm hm.

8     Q     If we look at the top of Exhibit 16, where it

9  says "Revolving Charge Account Agreement" and then

10 "Portland State University" above that, if we look at

11 Exhibit 1 --

12    A     That's the same.

13    Q     That is the same.  There's a different address

14 on one of the other versions, but.

15          So explain the differences in these two

16 agreements, then.

17    A     So, one of them was generated out of the pink

18 box, the data warehouse.  And so the person who wrote the

19 report, apparently, I don't know which one is which,

20 though.  The A, I believe, is the one -- or 1, sorry,

21 we're on numbers not letters now.

22          One and A are the same, is that true, between

23 these two folders?  Or --

24    Q     I don't believe so.

25    A     No.  Okay.

1          THE COURT:  I think they're the same document.

2    Look at the number at the bottom.

3      Q    (by Mr. Jones)  Is -- is 1 and A that we're

4    dealing with, was that your question, Ms. Powell?

5          THE COURT:  I think it's 16 --

6      A    1 and 16, or no.

7      Q    Right.

8          THE COURT:  -- 16 and --

9          THE WITNESS:  1.

10          THE COURT:  -- A are the same.

11          THE WITNESS:  Okay.

12          MR. JONES:  16 an A.

13          THE COURT:  16 and A have the same PSU

14    numbering, right?  PSUNIV2000036.

15          MR. JONES:  Right.

16          THE COURT:  And the difference between A and 16

17    is that PSU has added "Exhibit A, page 1 of 2" on it,

18    right?  That's the difference between -- right?

19          MR. JONES:  Between the two versions of the --

20          THE COURT:  Between A and 16.

21          MR. JONES:  I believe that's correct.

22          My confusion initially was that the RCAP that

23    was produced in Mrs. Looney's declaration is -- was

24    different, so I had to refer back to Exhibit 1 of

25    Plaintiff's, because that's what was produced in their

1  declaration.

2          THE COURT:  Well, that's fine.  1 -- but the

3  difference between your 16 and PSU's A --

4          MR. JONES:  Mm hm.

5          THE COURT:  -- is only the identifier that was

6  put on by counsel.

7          MR. JONES:  Correct.

8          THE COURT:  Correct?  So A and 16 are the same

9  document.

10         So now you're asking about differences between

11 1 and 16, right?

12         MR. JONES:  Correct.

13         THE COURT:  Okay.

14         MR. JONES:  Thank you.

15    Q    (by Mr. Jones)  So again, I'll repeat my

16 question.

17         Would you describe to me why in this retrieval

18 of the versions of the RCAP from the data warehouse, why

19 these differences or discrepancies would occur in these

20 different versions of the RCAP?

21    A    Oh, I believe it's A and 16 came from the data

22 warehouse.  And then where did 1 come from?

23    Q    I don't know.

24    A    You -- you provided it, though.

25    Q    Well, if we look at 1, you see the numbers

1 below, it was -- indicates that it was provided by PSU.

2 And that's my question.

3        Is -- is how those difference --

4        THE COURT:  If you don't know the answer, you

5 don't know the answer.

6    A    Yeah, I mean, it's just we decided fonts and

7 formats.  Again, though, the data is the same, and the

8 content's the same.

9    Q    So --

10        THE COURT:  Well, the data isn't exactly the

11 same.  There's a partial Social Security number on 1, and

12 there isn't that on 16.  The footer is different.

13 There's an address in 1, and that isn't in 16.

14        MR. JONES:  And the date.

15    Q    (by Mr. Jones)  So --

16        THE COURT:  The date is the same.

17    A    So --

18        THE COURT:  It's just a different time.

19    A    Yeah.

20    Q    Well --

21    A    We used to use Social Security number before it

22 was a secret PII number.  And then we stopped using that,

23 and started using accounts.

24    Q    So, it appears then that this data that's

25 entered into, or at least the -- the identifiers in this

1  form can be manipulated. We have two different versions.

2  So in some way or another, what comes out of -- out of

3  the system is data that can be manipulated and create

4  some discrepancies in the different RCAPs, correct?

5      A    But we don't know where 1 came from, do we?

6      Q    Well, I think if we look at the -- the bottom,

7  we can see that it was produced by PSU.

8      A    I mean, I don't know if it came out of the data

9  warehouse, though.

10     Q    Well, I -- I don't know where it came from.

11          MS. SINNOTT:  Your Honor, we will have a

12  witness to testify as to where these two versions came

13  from.

14          THE COURT:  Okay.

15          MS. SINNOTT:  It's not Ms. Powell.  I don't

16  know if that might help.

17          MR. JONES:  No further questions.  Thank you.

18          MS. SINNOTT:  Can -- can I just ask a couple of

19  follow-up questions?

20

21              **REDIRECT EXAMINATION**

22  BY MS. SINNOTT:

23     Q    Thank you, Ms. Powell.

24          So I just want to make sure that everyone is

25  clear on how Mr. Soballe would have agreed to the RCAP in

1   2010.

2          So, you testified earlier that when he changed

3   his password, and that would have been through the OAM,

4   and I actually don't have one of the pages in front of

5   me, but that's -- the OAM was what box? Can you just

6   hold it up so I can see it? I gave away all my copies.

7       A    Oh, the blue box.

8       Q    Yeah, so --

9            THE COURT:  Blue.

10      Q    -- so when -- when Mr. Soballe went into OAM to

11  change his password, was it your testimony that he would

12  have had to accept the three policies, including the

13  RCAP, before he could change his password?

14      A    Yes.

15      Q    Okay.  And that OAM data is reflected in

16  Exhibit E, correct?

17      A    Yes.

18      Q    Additionally, before he could register in

19  Banner, which is the other box, he would have had to

20  click the terms and conditions in Exhibit C.  He would

21  have had to have clicked "accept" on the terms and

22  conditions in Exhibit C, is that correct?

23      A    Correct.

24      Q    Okay.  Then both of these sets of data is swept

25  into the data warehouse, where in that data warehouse, it

1   is read-only, is that correct?

2      A    Correct.

3      Q    And did you retrieve the audit trails for both

4   the OAM password change and the Banweb acceptance of

5   terms and conditions -- oh, actually we -- yeah, the

6   password -- no, wait, sorry.

7        Did you get the -- the data from the OAM

8   password change from the data warehouse?

9      A    Yes.

10      Q    Okay.

11        MS. SINNOTT:  That's all I have.  I hope that

12   helped clarify.

13        THE COURT:  It did.

14        THE WITNESS:  Well, I did have one idea.  I

15   don't know if I should say, but --

16        THE COURT:  Yeah, no, don't guess.

17        THE WITNESS:  Okay, I was going to guess, yeah.

18        THE COURT:  Yeah, don't --

19        (Laughing)

20        MS. SINNOTT:  No further questions.

21        (Laughing)

22        THE COURT:  Don't -- yeah, you don't answer

23   questions if nobody's asking you a question.

24        May this witness be excused?  You can stay if

25   you want, but --

1          MS. SINNOTT:  I am fine with that.

2          MR. JONES:  Yes.

3          THE COURT:  You're -- you're not required to.

4          THE WITNESS:  Okay.

5          MS. SINNOTT:  Your Honor, I would like to call

6   Nicolle DuPont.

7          THE COURT:  Okay.

8

9                     **NICOLLE DUPONT**

10  called as a witness by the Creditor PSU, having being

11  first duly sworn, was examined and testified as follows:

12         THE COURT:  Please be seated.  State your full

13  name and spell your last name for the record.

14         THE WITNESS:  Nicolle DuPont, D-u-P-o-n-t.

15         THE COURT:  All right.

16         MS. SINNOTT:  Thank you, Ms. DuPont.  And can

17  you just alert the Court as to a hearing issue that you

18  might have?

19         THE WITNESS:  I can't hear out of my right ear.

20         MS. SINNOTT  Okay, so we'll make sure that if

21  you -- when we ask a question, if you can't hear it,

22  please let us know.

23         THE WITNESS:  I will.

24         MS. SINNOTT:  Thank you.

25         THE COURT:  And we also have, maybe --

1          THE CLERK:  I'm not sure those are going to

2    help.

3          THE COURT:  Okay.  All right.

4          MS. SINNOTT:  Just -- just let us --

5          THE WITNESS:  I should be fine.

6          MS. SINNOTT:  We'll -- we'll try to speak --

7          THE WITNESS:  I'll turn.

8          MS. SINNOTT:  Okay, great, thank you.

9                    **DIRECT EXAMINATION**

10   BY MS. SINNOTT:

11        Q    Ms. DuPont, can you tell me where do you work?

12        A    I work at Portland State University.

13        Q    And what is your title at Portland State

14   University?

15        A    I'm Associate Registrar for Registration,

16   Records and Operations.

17        Q    And what are your responsibilities as Associate

18   Registrar?

19        A    I primarily oversee the procedures surrounding

20   registration, recordkeeping, and the front line service

21   for the Registrar's Office.

22        Q    Can you explain, what does front line service

23   mean?

24        A    Sorry, that is the folks who work at the front

25   counter, answer the phones and respond to our service

1  email account, registrar@pdx.edu.

2      Q    Great.  And how long have you worked for the

3  Office of the Registrar?

4      A    For 15 years.

5      Q    So is it safe to say you're familiar with the

6  procedures of the Office of the Registrar?

7      A    Yes.

8      Q    Can you please turn to Exhibit F?

9      A    Yes.

10     Q    And just in the interest of time, I'll tell

11 you, it looks like there are four different records in

12 Exhibit F.

13     A    Yes.  Yes.

14          THE COURT:  Oh, mic is not working.

15     A    Yes.

16     Q    Do you recognize these records?

17     A    Yes.

18     Q    And how do you recognize these records?

19     A    I produced them.

20     Q    And can you tell me how you accessed these

21 records?

22     A    Sure.  The first page, I went into the Banner

23 Student Information System and did a screenshot.

24          The second page, which is the student schedule

25 as it appears in Banweb, I went into the web portal and

1  did a screenshot of how it would appear if a student or

2  advisor were to log into the web portal of Banner.

3       The next document is a few pages, and it's the

4  academic transcript, which I printed out through the

5  Banner Student Information System.

6       And the last page is screenshots of the

7  registration audit trail from the Banner Student

8  Information System.

9    Q    Thank you.  So from this first page, it looks

10 like at the top here -- actually, I'm sorry, let's go to

11 the second page.

12   A    Yes.

13   Q    So, can you just describe what specifically

14 this document is?

15   A    This is the document that's a screenshot of

16 what would appear in the Banweb Student Information

17 System.  That's the portal that students use to access

18 their own account.  They can add and drop classes or

19 courses from Banweb.  They can also view their current

20 term registration or a future term registration, if

21 they've already registered.  They can view their grades,

22 they can view how much money they owe, they can view

23 their major.

24       So this is --

25   Q    Okay, so --

1      A      -- what you get if you click on the Student

2  Schedule Detail.

3      Q      Great.  And so does this document show what

4  courses Mr. Soballe registered for in fall 2010?

5      A      Yes.

6      Q      And does it show when he registered for the

7  classes?

8      A      Yes.  In each chunk, under the course, there's

9  a status field, and it has both the date and the manner

10  in which the student registered.  So it shows, for

11  instance on the first line under "Intro to Genetics

12  Recitation", that it was registered on the web.  So that

13  would mean the student registered through this Banweb

14  portal, which requires student ID or OAM information, as

15  well as a password.  And it records the date.  So he

16  registered on August 21st, 2010, for that class.

17      Q      Okay.  Can you please turn to Exhibit H?

18      A      Yes.

19      Q      And do you recognize this document?

20      A      Yes.

21      Q      What is this?

22      A      This is a photocopy of the Registration Guide

23  for the 2010-2011 academic year.

24      Q      Can you turn to page 18 of 40, it's down there

25  at the bottom?

1      A      Yes.

2      Q      And right there on the first column, there's a

3  tuition refund policy?

4      A      Yes.

5      Q      Oh, I think that -- it just went out for a

6  moment.  Along with a refund schedule?

7      A      Yes.

8             THE CLERK:  Can we stop for a second?

9             THE COURT:  Hang on a second.

10             THE CLERK:  If people have cell phones and

11  they're on mute, that's going to cause that problem.  So

12  cell phones should be --

13             THE COURT:  Everybody needs to turn their cell

14  phones off.

15             THE CLERK:  Completely off.

16             THE COURT:  Not -- completely off.  Right?  Not

17  just silenced.  Okay.

18      Q      (by Ms. Sinnott)  Okay, so looking at this

19  tuition refund policy, can you just read there the refund

20  schedule under fall 2010 for me?

21      A      Yes.  So the fall 2010, it shows the dates in

22  which you can receive a particular type of refund.  So

23  for fall of 2010, you could receive 100 percent refund if

24  you dropped your courses on or before October 3rd.  You

25  would receive a 70 percent refund from October 4th

1   through the 10th, a 40 percent refund October 11th

2   through the 17th, and a 20 percent refund October 18th

3   through the 24th.

4       Q    And are there other ways that students could

5   obtain a refund after missing any of those deadlines?

6       A    Sure.  If a student does not take appropriate

7   actions to drop or withdraw from a course during the

8   scheduled refund periods, we have a petition called the

9   Deadline Appeal Petition that a student can submit during

10  the term and explain why they missed one of the

11  deadlines, and they can ask for a drop or a withdraw, and

12  they can ask for a refund.  And that would be available

13  to them during the rest of the fall quarter.

14          If a student does not do that, they still have

15  another chance to use a Past Term Petition to explain why

16  they missed the deadlines and why they didn't take care

17  of it during the current term.  And we accept those after

18  the term is over.

19      Q    So really, there are two -- what you're saying,

20  there are two different ways you could go.  The student

21  could either just, as of course, go in, drop a class

22  during the deadlines listed in this Registration Guide --

23      A    Mm hm.

24      Q    -- or, alternatively, if they fail to do that,

25  would they then be able to submit two different petitions

1  up to a year later to obtain a retroactive refund?

2      A    Yes.

3      Q    If a student is locked out of his or her online

4  account for registration, there's a registration hold on

5  that account, are there other ways that a student can

6  drop his or her courses?

7      A    Yes.  A student, if they have some type of a

8  hold preventing them from making registration changes on

9  Banweb, they can contact the Office of the Registrar.  We

10  will help them either in person or via email or via fax,

11  as long as they can request the drop and provide their

12  signature, or via email they can provide their student ID

13  number and email us from their PSU email account.

14      Q    So, essentially, an online hold does not

15  prevent a student from dropping a class in alternative

16  ways.

17      A    That's correct.

18      Q    Do you ever help students drop classes in these

19  ways?

20      A    All the time.  Yeah.  Throughout the deadline -

21  - throughout the deadline periods, we routinely help

22  folks do it manually through the Registrar's Office, in

23  person or remotely.

24      Q    And the Registration Guide in Exhibit H, is

25  that available -- how -- how would a student have access

1    to that guide?

2         A    So, in 2010, we were still printing physical

3    copies of the Registration Guide, which were available at

4    the Registrar's Office, at the Bookstore, at the Student

5    Store, or in advising centers.

6              And then we also had a PDF of the Registration

7    Guide on our website.

8         Q    Okay.  Do you have any personal knowledge of

9    Mr. Soballe contacting the Registrar's Office in the fall

10   of 2010 to drop his classes?

11        A    No, I don't.  And I -- I did check to see if we

12   had any email correspondence in our service email

13   account, registrar@pdx.edu, which we archive the

14   conversations, and there -- there was nothing in the

15   email account, either.

16        Q    So one of -- one of the documents you provided

17   to me during the course of this proceeding, which we

18   produced to the other side, it's not an exhibit, but it

19   does -- it did show what the ending registration numbers

20   were for each course.  Do you recall that document?

21        A    Yes.

22        Q    Would that record have shown whether a class

23   was full or not at the beginning of a semester?  Or I'm

24   sorry, at the beginning of a term?

25        A    No.  The document -- when we look historically

1  into the course enrollment data, it's going to show how

2  many students were registered when the course ended, and

3  those enrollments were rolled to student history.

4           So we don't have anything in the Banner Student

5  Information System that shows how many people were

6  registered on a particular day, like day one of the term.

7  And a lot of students do drop during the first four weeks

8  of the term.

9           THE CLERK:  Cut out?

10          THE COURT:  It did.  Maybe you can have IT come

11 up and look at noon?

12          THE CLERK:  Mr. -- Mr. Fuller, is your computer

13 set up to -- are you receiving emails during the course

14 of this --

15          MR. FULLER:  No.

16          MS. SINNOTT:  I'll make sure my WiFi's off,

17 too.

18     Q    (by Ms. Sinnott)  Can you please turn back to

19 Exhibit F?

20     A    Yes.

21     Q    Go -- go to page 5 of 7, please.

22     A    Okay.

23     Q    So down at the fall 2010 quarter, it looks like

24 there are X's next to those courses?

25     A    Yes.

1    Q    What does an X mean?

2    A    An X means no basis for grade.

3    Q    Does an X mean -- would it have anything to do

4  with whether a debtor -- or would it conclusively

5  establish whether a debtor attended classes or not --

6  excuse me, whether a student attended classes or not?

7    A    No.  An X just means no basis for grade.  It

8  could be for non-attendance.  It could also be for non-

9  participation.  It could be a student that attended but

10  never turned in any work.

11    Q    So if somebody at PSU were to look at the

12  Debtor's transcript here, they would not know whether or

13  not Mr. Soballe attended those three classes in the fall

14  2010 term?

15    A    That is correct.

16         MS. SINNOTT:  I have no further questions.

17

18                   **CROSS EXAMINATION**

19  BY MR. JONES:

20    Q    Hi, Ms. DuPont.

21    A    Hello.

22    Q    Just give me one second, if you would.

23         THE COURT:  And you will need to talk into the

24  microphone when you start asking questions.

25         MR. JONES:  Thank you, Your Honor.

1         MS. SINNOTT:  While he's looking, can I just

2    clarify, we had stipulated to the authenticity of the

3    exhibits.  Do I still need to offer the exhibits I just

4    referenced, or can we admit them?

5         THE COURT:  I admitted them.

6         MS. SINNOTT:  Okay, great.  Thank you.

7         THE COURT:  They can talk about relevance, but

8    I admitted them.

9         MS. SINNOTT:  Okay.

10        MR. JONES:  On -- on that note, if I may, Your

11   Honor, Exhibit -- Debtor's Exhibit 16, I did not offer

12   that for admission into evidence.  It was really --

13        THE COURT:  It came in already.

14        MR. JONES:  Exhibit 16?

15        MS. SINNOTT:  16.

16        THE COURT:  All of your exhibits came in.

17        MR. JONES:  Oh, that's right.  Thank you.

18   Well, I guess on that note, the purpose of offering that

19   exhibit was really for impeachment purposes to compare

20   those two versions.  Not that Debtor has any

21   understanding whether the version in 16 or Exhibit --

22   PSU's Exhibit A or 1 is the authenticated --

23        THE COURT:  Yeah, you can talk to me about that

24   in closing.  But it's admitted.

25        MR. JONES:  Thank you.

1    Q    (by Mr. Jones)  So I think we'll start off with

2    what we've already reviewed here as PSU's Exhibit H,

3    which is the Registration Guide.  And opposing counsel

4    has already pointed out a refund schedule on page 18,

5    pertaining to the fall 2010 term.

6    A    Yes.

7    Q    And just to clarify, "refund" doesn't mean that

8    the -- the student, such as Mr. Soballe, would actually

9    get any money back.  It's -- it would just be a reduction

10   in the amount that they owed PSU, correct?

11   A    Right.  The -- if the person had already paid,

12   they would get a refund.  If the person had not paid,

13   there would be a refund to the charges.  So it would --

14   the student might owe less.

15   Q    So a reduction in the charges, right.

16   A    Yes.

17   Q    So I see that this Registration Guide talks

18   about, you know, a percentage of reduction that may

19   happen if the student dropped classes within different

20   periods of time throughout the term.  What -- what I

21   don't see, perhaps you could help me, is there any

22   directions about how a student would drop classes in the

23   Registration Guide that you're aware of?

24        (Pause)

25   Q    I mean, I -- I don't expect you to review the

1  whole agreement.  I think we did cover this in your

2  deposition, if you recall.

3       A    So, in page 10, it has registration basics,

4  when to register, how long the online registration hours

5  are available, the academic calendar, the where to find

6  the deadlines.

7       Q    So again, how to -- this is how to register,

8  what are the deadlines, but no information about how to

9  drop --

10      A    Dropping is an act --

11      Q    -- specifically.

12      A    -- is considered the same as registration, it's

13  all part of managing your courses.

14           But no, nothing specifically that calls out

15  that you should do the same thing that you did to add to

16  drop.

17      Q    Right.  Or if you added online, and -- and

18  there was a hold on the account, then you wouldn't be

19  able to do the same thing, using online to drop.

20      A    Correct.

21      Q    Correct.  Now we're going to flip to the --

22  back to the registration, or the course registration

23  information that you reviewed with counsel.

24      A    Which exhibit?

25      Q    I think we'll go to -- we'll start with Exhibit

1  F.  It's Exhibit F, I think all the registration data.

2      A    Okay.

3      Q    And specifically, I guess we're going to look

4  at page -- well, let's start with page 3.  And we'll kind

5  of take pages 3 through 5 of Exhibit F kind of in unison.

6  And so these pages 3 to 5 here are -- show the courses

7  that Mr. Soballe registered for in fall 2010, correct?

8      A    Three through 5 are an academic transcript, so

9  it shows the courses that are part of his academic

10  history.

11     Q    Mm hm.  And -- and part of that would be the

12  fall 2010 courses, isn't that correct?

13     A    Correct.

14     Q    And Mr. Soballe received no credit and/or

15  failing grades for fall 2010, correct?

16     A    Correct, he did not earn credit.

17     Q    Is it PSU's policy, at least in 2000 -- the

18  fall of 2010 semester, was that instructors were not

19  required to track attendance at all, is that correct?

20     A    That's correct, we do not have a mandatory

21  attendance policy.  We didn't in 2010, and we don't

22  currently.

23     Q    Okay.  So I'm going to have you look at our

24  exhibit list, because I think there's some registration

25  information that may be omitted in this version.  And if

1  you give me a second, I'll tell you where to go.  Looks

2  like exhibit 2 in that binder.

3     A    Okay.

4        THE COURT:  Oh, we've got to get that fixed.

5        THE CLERK:  Didn't hear it that time.

6        THE WITNESS:  Could it be my hearing aid?

7        THE CLERK:  Possible.

8        THE WITNESS:  I can take it out.

9        THE COURT:  No-no-no, that's fine.  But knowing

10  that that's -- might be an issue, that's helpful.  So

11  that's fine.

12     Q    (by Mr. Jones)  So we're going to flip through

13  the page in Exhibit B, I think it's helpful if you kind

14  of look at the -- the PSUUNIV number that's at the

15  bottom, because these pages aren't specifically marked.

16  You'll keep flipping through, and it will be PSUUNIV2-a

17  bunch-of-zeros-ending-in-a-1, at the top of that page I

18  want you to flip to, it also says "21 Course Enrollment

19  Data".

20     A    Yes.

21     Q    Are you on there?

22        THE COURT:  No.  Mine starts at 3.

23        MR. JONES:  Yeah, it does start at 3, because

24  it made sense to put them that way for the deposition,

25  but --

1          THE COURT:  Okay, all right.  Thank you.

2          MR. JONES:  Yeah, it's like the eighth page, I

3    believe.

4          THE COURT:  Yeah, I got it.

5     Q     (by Mr. Jones)  Okay, Ms. DuPont.  So it is

6    true that at least at the end of fall 2010, that the

7    courses that Mr. Soballe registered for were not fully

8    attended.  There were open seats in each one of those

9    classes, correct?  And that's what this --

10    A     Yes.

11    Q     -- image shows.  And it's true that for these

12   classes that Mr. Soballe registered for for fall 2010,

13   that no tracking of attendance was required by the

14   instructors of those courses, correct?

15    A     Correct.

16    Q     So there's no way to -- for PSU to know whether

17   Mr. Soballe actually attended the classes or not?

18    A     Correct.

19    Q     Okay, I think we're going to stick with this

20   binder, and we're going to flip to Exhibit 14, if you

21   would.

22    A     I don't have a 14.  I go from --

23          THE COURT:  5 to 16 --

24    A     -- 2 to 3 to 5 to 16.

25          THE COURT:  Which is what I was asking about

1  earlier.

2          MR. JONES:  All right, let me check our -- do

3  you have a copy of our exhibit list?  It's a declaration.

4          What I'm looking for is your declaration that

5  you filed in this case, actually.  We did not list that

6  on our exhibit list.  It's -- it's actually Ms. DuPont's

7  declaration that was already filed in this matter.

8          THE COURT:  Why don't you just ask her a

9  question about it?  It doesn't have to be an exhibit.

10         MR. JONES:  Okay.  Well, there are some

11 documents that are attached to the declaration, and

12 that's --

13         THE COURT:  Well, that's a problem.

14         MR. JONES:  Yeah.

15         THE COURT:  You can ask her questions, though.

16         MR. JONES:  All right.  So --

17         THE COURT:  What's the --

18     Q    (by Mr. Jones)  What I'm -- what I'm asking

19 questions about, there's -- there's -- if you can recall,

20 there's a declaration that you filed in this -- in this

21 case, and there was two documents attached to it, and

22 you've already talked about those two documents.  One was

23 called a Special Registration Form.

24     A    Yes.

25     Q    And one is called a Deadline Appeals Petition.

1    A    Yes.

2    Q    Deadline Appeals Board Petition.  Those are the

3  questions I'm going to ask about these documents.

4    A    Okay.

5         THE COURT:  Can you tell me what document

6  you're talking about?

7         MR. JONES:  So, it's --

8         THE COURT:  Document 24?

9         MR. JONES:  -- it's Exhibit --

10         MR. FULLER:  24.

11         MR. JONES:  It's, yeah.

12         THE COURT:  Document 24, okay.

13         THE WITNESS:  Am I supposed to be able to see

14  this?

15         THE COURT:  No, you don't have it.

16         THE WITNESS:  Okay.

17         THE COURT:  He's just going to ask you

18  questions about it, and --

19         THE WITNESS:  I'm familiar with what those are.

20         THE COURT:  Okay.

21    Q    (by Mr. Jones)  Okay.  And -- and if I can,

22  I'll ask the Court's permission, if we need to, I can --

23  I can walk up there and -- and actually --

24    A    I know what the documents look like.  It's

25  fine.

1    Q    Okay.  So specifically we're talking about

2    Exhibit 1, the Special Registration Form.

3         And at the -- at the top of that form, maybe I

4    can just read from this and you can verify that's what

5    the form says.

6    A    Sure.

7    Q    It says, "Complete this form and bring it in

8    person to the Admissions, Registration and Records

9    windows in the Neuberger Hall lobby after any required

10   approvals."  Is that correct?

11   A    I believe you.

12   Q    So if a student were to get one of these

13   Special Registration Forms and they were to read it, then

14   it would appear that the only way that they would be able

15   to submit it, because the only way mentioned is to submit

16   it in person, correct?

17   A    I believe that also has our contact information

18   on it, too, though.  I'm not sure, at the bottom, if you

19   can see what year that document, if that was the actual

20   document that was in place in 2010 or not.

21   Q    It says October of 2008.

22   A    Okay.  Then that was probably the one that was

23   being used in 2010.

24   Q    And I don't see any contact information, at

25   least on the one that's submitted.

1      A     Okay.

2      Q     And now I'm going to ask a few questions about

3   the Deadline Appeals Board Petition that you spoke of.

4      A     Sure.

5      Q     And on this Deadline Appeals Board Petition, in

6   section 2 labeled "Instructor Statement", and it says,

7   "An instructor statement, signature and date are

8   required," and "required" is bolded, "for the Committee

9   to consider the petition.  You may attach an email

10  statement from the instructor."  And it has two little

11  arrows below that.  "The instructor statement must be

12  written after the student's explanation."  And then

13  second arrow, "To drop a class never attended and to

14  receive a refund, the instructor must verify the

15  student's non-attendance statement."

16     A     Correct.

17     Q     Okay.  So you've already testified that

18  tracking attendance was not a requirement for the

19  instructors in any course.

20     A     Correct.

21     Q     So if the instructors in the 2010 fall classes

22  that Mr. Soballe registered for did not track attendance,

23  it may be impossible for him to have -- or a student in

24  his position to have gotten a written statement from the

25  instructor that says is required in bold to even consider

1  the petition.  They wouldn't be able to necessarily

2  verify their non-attendance if there was no attendance

3  taken.

4      A    Just because we don't require instructors to

5  take attendance and track it centrally, doesn't mean that

6  individual instructors don't actually track attendance

7  for their own class.

8          So we -- we routinely get statements from

9  instructors that verify, "I have no evidence of this

10  student attending or participating."  It's up to each

11  instructor to manage their classrooms how they see fit.

12     Q    I understand.  Do you have any personal

13  knowledge of whether the instructors for those fall 2010

14  classes that Mr. Soballe registered for kept attendance?

15     A    I have no idea.

16     Q    Thank you.

17          MR. JONES:  I don't think I have any further

18  questions.  I just want to take a second to make sure so

19  I don't have to recross.

20          (Pause)

21          MR. JONES:  I think that's all for Debtor.

22          MS. SINNOTT:  I have just one quick follow up.

23  //

24  //

25  //

1       **REDIRECT EXAMINATION**

2    MS. SINNOTT:

3        Q    Can you please turn to Exhibit H, page 14?  Or

4    I'm sorry, page 12 of 40?

5             MR. JONES:  I'm sorry, which --

6        A    Yes.

7             MS. SINNOTT:  Exhibit H, page 12 of 40.

8        Q    (by Ms. Sinnott)  And in the middle of that

9    page, there is a portion that says "Registration Holds".

10       A    Yes.

11       Q    And isn't it true that this portion of the

12   document directs students on where to go or who to call

13   if they have a registration hold on their account?

14       A    Yes, it does.  It directs students to contact

15   the Office of Admissions, Records and Registration, which

16   is my office.

17       Q    Thank you.

18            MS. SINNOTT:  I have no further questions.

19            THE COURT:  All right, you may step down.  Can

20   this witness be excused?

21            MS. SINNOTT:  You may.

22            THE COURT:  All right.  So do you want to take

23   a short break before we --?  So let's start again at 11.

24   Realize wherever we are at noon, we have to stop.  Okay.

25   //

1    MS. SINNOTT:  That sounds good to me.  Thank

2  you.

3    THE COURT:  Okay.

4    (Recess)

5    THE CLERK:  Please rise.  Court is once again

6  in session, the Honorable Trish M. Brown presiding.

7  Please be seated.

8    MS. SINNOTT:  Your Honor, I'd like to call

9  Megan Looney.

10

11                    **MEGAN LOONEY**

12  called as a witness by the Creditor PSU, having being

13  first duly sworn, was examined and testified as follows:

14    THE COURT:  Please be seated, state your full

15  name and spell your last name for the record.

16    THE WITNESS:  It's Megan Maisel Looney, L-o-o-

17  n-e-y.

18                  **DIRECT EXAMINATION**

19  BY MS. SINNOTT:

20    Q    Good morning, Megan.

21    A    Good morning.

22    Q    Megan -- or, I'm sorry -- Ms. Looney -- again,

23  Ms. Looney.

24    Ms. Looney, where do you work?

25    A    Portland State University.

1    Q    And can you tell me what is your title at

2  Portland State?

3    A    Currently, Assistant Director of Student

4  Financial Services.

5    Q    And how long have you worked at Student

6  Financial Services?

7    A    Of my 21 years at PSU, 19 have been within

8  Student Financial Services.

9    Q    And what are your responsibilities as Assistant

10  Director of Student Financial Services?

11    A    I oversee the student accounts, student

12  collections and cashier branches within Student Financial

13  Services.

14    Q    And are you generally familiar with the

15  procedures and policies of Student Financial Services?

16    A    Yes.

17    Q    Can you please turn to Exhibit K?

18    A    Yes.

19    Q    Do you recognize this document?

20    A    Yes.

21    Q    And can you explain what it is?

22    A    It's an email that I sent to Mr. Soballe at his

23  request of the Revolving Charge Account Agreement.

24    Q    And why did you send this to Mr. Soballe?

25    A    Per his request.

1  Q    And how did you obtain a copy of this RCAP in

2  Exhibit K?

3  A    At the time he made this request, I did not

4  have direct access to the data warehouse where this was

5  stored.  We had migrated to a new system.  And the data

6  warehouse that we are currently using did not contain

7  this data.  So I had to put in a request to get somebody

8  to pull that data out of our old warehouse information.

9  And what I gave to Mr. Soballe was the information that

10 that person gave me from that database.

11 Q    So you obtained this version of the RCAP from

12 another person.

13 A    Correct.  Who had access to that old data.

14 Q    Great.  And can you turn to -- well, actually,

15 let me back up.

16      So during the course of this proceeding, did

17 you provide me with a copy of the Debtor's RCAP?

18 A    Yes.

19 Q    And where did you get that version of the RCAP?

20 A    Based upon the difficulty of having to always

21 put in a request to get an RCAP whenever I needed one, I

22 had requested for IT to move that information over to our

23 current data warehouse system.  And they had been able to

24 do that.

25      And so what I supplied you was whatever had

1  been put into our new data warehouse, and the report had

2  been written to provide that data.

3      Q    So can you explain to me then why the format

4  would have been different between these two documents, to

5  the best of your knowledge?

6      A    So I think it's what Ms. Powell had referred to

7  earlier, is that whoever, in the new data warehouse,

8  selected the font and how to present the information,

9  presented it differently than how it had been presented

10  in our old data warehouse.

11      Q    And can you -- I'm going to ask you to look at

12  three exhibits.

13      A    Okay.

14      Q    So the first is Exhibit A.  And the second is

15  Exhibit D.

16      A    Okay.

17      Q    And the third is Exhibit K.

18      A    Yes.

19      Q    Have you had an opportunity to compare the

20  substantive language of each of these three versions of

21  the RCAP?

22      A    Yes.

23      Q    And are -- is the substantive language of these

24  three versions identical?

25      A    Yes.

1    Q    Why did you provide Mr. Soballe in 2013 and me

2    recently with the 2005 version of his RCAP?

3    A    So, when I had looked at his -- his Report 19,

4    which is Exhibit M, it had referenced a RCAP from 2007.

5    And that was the basis upon what I was working on.  And I

6    had -- my misunderstanding was that I had assumed all the

7    data was merged into one report.  And I did not

8    understand -- I now have been corrected -- that there are

9    now two reports.  And one is the information that is the

10   OAM data, versus what I had pulled, which was the old

11   substant -- the old RCAP information that came from the

12   prior warehouse.  And so I -- there were two different

13   reports, and I was unaware of the other.

14   Q    So let's actually to go Exhibit M, just so we

15   can make sure we're on the same page as you.

16   A    Mm hm.

17   Q    So when you're saying there was a 2007 RCAP

18   referenced --

19   A    Mm hm.

20   Q    -- is it because on the left-hand side, about

21   five lines down, it says "RCAP 2007-04"?

22   A    Right.

23   Q    And what would that mean?  What would 2007-04

24   mean?

25   A    That would indicate that he had signed the RCAP

1  in fall of 2007.

2      Q    So what you're saying is, when you looked at

3  his Report 19, which is this Exhibit M --

4      A    Mm hmm.

5      Q    -- you assumed that the RCAP that was governing

6  his account was this 2007 RCAP.

7      A    Right.  It did not even occur to me to look for

8  more current OAM data.

9      Q    Okay.

10          THE COURT:  Okay, can I stop you?  I have no

11  idea what you are looking at.

12          MS. SINNOTT:  Exhibit -- Exhibit M.

13          THE COURT:  I got Exhibit M up.

14          THE WITNESS:  Yeah, it's --

15          MS. SINNOTT:  Okay, so at the top left-hand --

16          THE COURT:  Oh, "RCAP 2007-04"?

17          MS. SINNOTT:  Yes.

18          THE COURT:  Okay.  All right.

19      Q    (by Ms. Sinnott)  So, Ms. Looney, this Report

20  19, which is Exhibit M --

21      A    Mm hm.

22      Q    -- you call it Report 19, correct?

23      A    Mm hm, yeah.

24      Q    This is what you would pull up when a student

25  was asking about his or her account, is that correct?

1    A    Essentially.  I mean, I pull that up in Banner,

2  this is a report that we typically provide to students,

3  because it provides it in a nice concise format.  But

4  yes, if I were to print anything off, this is what I'd

5  print off.  Oh, I look at it in Banner, it -- it's the

6  same information just presented differently.

7    Q    Okay.  Is your department in charge of putting

8  registration holds on student accounts?

9    A    For nonpayment, yes.

10   Q    And did your department put a registration hold

11  on Mr. Soballe's account in 2010?

12   A    Yes, we did.

13   Q    And what was the date of that registration

14  hold?

15   A    We placed it on October 20th of 2010.

16   Q    So before October 20th of 2010, would Debtor

17  have been able to access his online account to drop his

18  classes?

19   A    Yes.

20   Q    Can you please turn to Exhibit L?

21   A    Yes.

22   Q    Do you recognize this document?

23   A    Yes.

24   Q    And what is this?

25   A    This is a registration -- register screen, in

1  which we can give them permission to override the

2  transcript hold that we place on student accounts.

3       Q    And does this show that you -- you released

4  transcripts to Mr. Soballe?

5       A    Yes, twice.

6       Q    And do you recall the circumstances of

7  releasing those transcripts?

8       A    I did not do the one in October of 2015.  I did

9  do the one in March of 2016, and yes, he needed that to

10  be sent to an employer.

11      Q    The one from October 21st --

12      A    2015 was done by someone else in my office.

13  But it was -- it was for something we would typically

14  release a transcript for.  It was for employment, it was

15  going to the Portland Police Bureau.

16      Q    Okay.  Can you please turn to Exhibit K again?

17      A    Yes.

18      Q    Can you just read for me paragraph 10, where it

19  says "Billing Rate Summary"?

20      A    "In case of errors or questions, the debtor may

21  challenge a charge within 60 days after the first billing

22  statement on which the suspected error or problem

23  appeared by directing his/her inquiry to the office

24  initiating the charge.  If an error occurred, affected

25  charges will be adjusted.  Tuition charges are disputed

1   by petitioning Admissions and Records within 12 months.

2   After these deadlines, tuition and other charges are

3   disputed via hearing letter to the Bursar's Office, PO

4   Box 202, Portland, 97207."

5       Q      Thank you.

6       A      Mm hm.

7       Q      Can you turn to Exhibit G?

8       A      Yes.

9       Q      Do you recognize these documents?

10      A      Yes.

11      Q      And what are they?

12      A      They are billing statements.

13      Q      And are they billing statements that were sent

14  to Mr. Soballe?

15      A      Yes.

16      Q      Does the Office of Student Financial Services

17  have any record of Mr. Soballe contacting the office

18  after receiving these billing statements?

19      A      No, we do not.

20      Q      Can you turn to Exhibit J?

21      A      Yes.

22      Q      Do you recognize this document?

23      A      Yes.

24      Q      Can you explain what it is?

25      A      This is the accounts receivable comments that

1  we use to memorialize any conversations that we have with

2  students that we think will be useful in the future.

3       Q    And on this specific document, it looks like

4  there's an entry for the 6th of August, 2013, is that

5  correct?

6       A    Correct.

7       Q    And it says, "JS called to dispute he owes fall

8  2010.  Claims that he wasn't able to drop the class."

9       A    Mm hm.

10      Q    Do you remember what the circumstances were of

11 Mr. Soballe contacting the Student Financial Services in

12 August of 2013?

13      A    No.  And it wasn't in -- the person who input

14 that was somebody within my office.

15      Q    So let me just ask you generally, this comment

16 screen, had a student contacted Student Financial

17 Services to dispute a debt, would the University have

18 saved that contact in this comment?

19      A    Generally.

20      Q    So other than the contact in August of 2013

21 that's represented in this document, which is maintained

22 in Portland State's business records, does Student

23 Financial Services have any other record of Mr. Soballe

24 contacting PSU to dispute his debt?

25      A    No, we do not.

1      Q    Can you please turn to Exhibit M?

2      A    Yes.

3      Q    Do you recognize this record?

4      A    Yes.

5      Q    We -- we already talked about it.  This is the

6  Report 19, is that correct?

7      A    Right.  Mm hm.

8      Q    Can you tell me what, on the first transaction

9  detail there --

10     A    Mm hm.

11     Q    -- number 411 --

12     A    Mm hm.

13     Q    -- what does that mean?

14     A    That is an entry saying that we have written

15  off his account, which means that we are no longer

16  actively collecting on it, aside from sending his

17  information to Oregon Department of Revenue for tax

18  offsets as a State agency.

19     Q    So at this point, PSU does not intend to

20  collect on this debt?  Is that correct?

21     A    No, outside of tax offsets, no.

22     Q    Can you please turn to Exhibit I?

23     A    Yes.

24     Q    Do you recognize this document?

25     A    Yes.

1        Q     Can you explain what this is?

2        A     This is the letter that was sent to him after

3    the discharge of his bankruptcy.

4        Q     And can you just please read paragraph 2?

5        A     "We have been advised by our attorneys at the

6    Oregon Department of Justice that the remaining debt you

7    owe Portland State University is not discharged under the

8    US Bankruptcy Code as amended in 2005."

9              MS. SINNOTT:  I have no further questions.

10

11                    **CROSS EXAMINATION**

12   BY MR. JONES:

13       Q     Hi, Ms. Looney.

14       A     Hi.

15       Q     So, I think we'll start off with PSU's exhibit

16   binder.  And I think we'll just look back at those, what

17   have been referred to as different version of the RCAP.

18   And I believe we can just use that folder and look to

19   Exhibit A and K.  But maybe not.  I think we'll have to

20   use our binder, if you look, the different version of the

21   agreement would be at 16 and 1.  I'm not going to ask

22   many questions about this.  From your testimony, would

23   you agree that there's some differences in these

24   agreements, and somehow some of the data that's entered

25   into these agreements and some of the headers and some of

1  the footers can -- were manipulated at some point to

2  create these differences?

3      A    In terms of the student specific data, yes.

4  Not --

5      Q    And also the -- the headers, the footers, the -

6  - the format of the date, etcetera, that they were

7  somehow manipulated from -- in these two different

8  versions, from the database.  Correct?

9      A    Yeah, I mean, they're presented out of two

10  different databases.

11     Q    Okay.  So, and forgive me, perhaps I'm a bit

12  slow.

13          But I'm having trouble understanding why there

14  is an agreement with an e-signature from 2005 --

15     A    Mm hm.

16     Q    -- that was presented as the agreement that is

17  operative as to this 2010 tuition debt.

18          And the code on -- I'm looking for the -- yeah,

19  M, so Exhibit M.  And you just answered some questions

20  about these documents with counsel.

21          So the 2007 RCAP, that seems to indicate that

22  there was an agreement that was assented to by Mr.

23  Soballe in 2007, but the only contract or agreement

24  that's been submitted that says it's the controlling

25  agreement has a e-signature from 2005.

1     A    Correct.

2     Q    So is it your understanding from that RCAP

3 2007-04 in Exhibit M that there would be another

4 agreement with a -- that he assented to that had an e-

5 signature or whatnot in 2007?

6     A    That was my understanding when I -- when I

7 first pulled the information, yes.

8     Q    That's not correct?  That's not what that

9 means?

10    A    I have been unable to get that document

11 produced.

12    Q    So this would indicate that there is an

13 agreement that he assented to in 2007, but you can't

14 produce that document.

15    A    Correct.

16    Q    So are you still maintaining that the agreement

17 that was allegedly e-signed in 2005 is the agreement that

18 controls as to the 2010 tuition debt, although there may

19 be another agreement in 2007?

20    A    Substantively, the -- the RCAP did not change

21 until 2010.

22         So this -- whether he agreed to it in 2005 or

23 2007, all that would be different would be the date and

24 the timestamp.  It was still the same Revolving Charge

25 Account Agreement information.

1    Q    Okay.  But wouldn't you agree then, I mean, you

2  have produced, and PSU's has produced this agreement from

3  2005 with the e-signature, seemingly that is relevant

4  that they -- that there's an e-signature and a date that

5  he accepted it.

6    A    Mm hm.

7    Q    Right?  But can't produce one from 2007.  So

8  you're saying it doesn't -- it doesn't really matter that

9  PSU can't produce an agreement that has this e-signature

10  and a date that Mr. Soballe assented to it, but

11  nonetheless, submitted this 2005 agreement with the

12  signature?

13          THE COURT:  Yeah, no, I didn't understand that

14  question at all.

15          MR. JONES:  Okay.  Okay.

16          THE COURT:  So no.

17          MR. JONES:  So --

18          THE COURT:  She doesn't have the 2 -- 2007

19  agreement.

20          MR. JONES:  I'm just --

21          THE COURT:  Okay?  So there's no question about

22  that.

23          MR. JONES:  Okay.

24    Q    (by Mr. Jones)  Can I ask, would there have

25  been an e-signature submitted on the 2007 agreement that

1  would look the same as this 2005 agreement?

2          THE COURT:  Yeah, you can ask that.  That

3  question makes sense to me.

4      A    Yes.

5          THE COURT:  Previous one denied.

6      A    There would have been.

7      Q    Do you know how the e-signature is -- is

8  produced onto the RCAP?

9      A    I do not.

10     Q    Let's take another look at Exhibit A on this --

11  this 2005 RCAP.

12          Could you read just briefly number 3 under

13  "Agreement" on the first page?

14     A    "This agreement is subject to the

15  Administrative Rules of Portland State University in

16  effect now or in effect when fees/charges are incurred."

17     Q    Did I say 2?  I meant 3.

18     A    Oh, I'm sorry.  "This agreement will remain in

19  effect as long as my account has an outstanding balance."

20     Q    Thank you.  And if we flip to page 2 of the

21  agreement, could you just read number 11?

22     A    "Notification of changes.  Portland State

23  University may amend these terms and conditions without

24  securing a new agreement.  Portland State University will

25  notice -- notify student of any changes in interest,

1   charges or fees in advance of the change.  If unpaid,

2   student is bound by the changes."

3        Q    Okay.  Would you agree that -- flipping back to

4   3, would you agree that number 3 is a pretty plain

5   statement that this 2005 agreement would remain in effect

6   as long as there was an outstanding balance?

7        A    Yes.

8        Q    So if Mr. Soballe did not have an outstanding

9   balance at any time after October 30th, 2005, became

10  current, then this agreement would not be in effect.

11       A    Yes.

12       Q    Thank you.  I have one more thing on this

13  agreement.  Sorry.

14            Back to page 2 and number 5, and I won't have

15  you read that.  If you can just see where it says

16  "Billing Charge" and it says, "A $5 billing charge will

17  be assessed on the next billing date if the total amount

18  due has not been paid during the grace period."  Is that

19  correct?

20       A    Yes.

21       Q    So there's a $5 billing charge.

22            Do you know if -- is a billing charge the same

23  thing to PSU as an account maintenance fee?

24       A    Yes.

25       Q    And sorry, back to 11.  I think I didn't ask

1   you that.  Are you aware of any documents or evidence of

2   PSU providing any notice of the change in terms of the

3   agreement, such as the change of the billing charge, for

4   example?

5        A    They -- aside from being put on our website, I

6   am not aware of anything specific sent to any student.

7        Q    Okay.  And if I can, I'll have you flip to

8   Exhibit M again.

9        A    Yes.

10       Q    And this is essentially an account history --

11       A    Correct.

12       Q    -- correct, of Mr. Soballe, PSU's history.

13  Okay.

14            And we're just going to -- we've already

15  covered that -- that RCAP language there, of the 2007.  I

16  think if we pan down a little bit, I think I'm going to

17  go to, actually page 2 of that exhibit.  And we'll just

18  take a look at a few example lines.  Line 371 and 365.

19       A    Mm hm.

20       Q    And do you see there, that's the account

21  maintenance fee, or what you've said PSU also refers to

22  as a -- as a billing charge?

23       A    Mm hm.

24       Q    And there's a 10 -- $10 --

25       A    Correct.

1    Q    -- charge there on July 13th -- or July 16th,

2 2013.  Yes?

3    A    Correct.

4    Q    And then in line 365, same thing, another date,

5 $10 billing fee on May 16th, 2013?

6    A    Yes.

7         MS. SINNOTT:  Your Honor, I'm going to object

8 on relevance grounds.

9         MR. JONES:  And Your Honor, I'm going to object

10 to the witness making eye contact fairly regularly with

11 her counsel.  It's probably on accident, but I'm just --

12        THE COURT:  She's allowed to have contact with

13 her counsel.  Give me a break.

14        MR. JONES:  She's -- from my point of view, it

15 appears that she's looking over there when there's a

16 pause in between her answer and the question.  I'm sure

17 it's on accident.  I'd just object to that.

18        THE COURT:  Objection overruled.  She can look

19 at her counsel.  And so what is the relevance?  That

20 there was a change.

21        MR. JONES:  So -- so if I'm trying to

22 understand this correctly, if there's a change in the

23 fee, PSU's witnesses are now saying that maybe there was

24 this -- these multiple times that Mr. Soballe went onto

25 this website and clicked a box agreeing to terms and

1  conditions, although it can't produce an agreement

2  related to that besides 2005.

3      If -- if Mr. Soballe by clicking the box was

4  agreeing to the original agreement, which it appears it

5  does from the exhibits, each time he did that, then he

6  would be agreeing to the terms of that original

7  agreement, which was a $5 billing fee.

8      So we're trying to present this evidence to --

9  to me, it calls into question, if he had assented to

10  these agreements over time, as late as 2015, long after

11  he was a student, and he was agreeing allegedly to the --

12  the blank old agreement that was in place that said it

13  had a $5 billing fee, if that's the case, then why is PSU

14  charging a $10 billing fee that wasn't in place at the

15  time.  I think that's the relevance of it.

16      MS. SINNOTT:  How does that go to whether this

17  is a student loan?

18      THE COURT:  I don't know.

19      MR. JONES:  Because whether it's a student

20  loan, one of the elements is that there has to be a valid

21  and enforceable agreement.  And I think what we're

22  leading to here is whether there actually is agreement,

23  whether he assented to an agreement at all.  PSU is

24  attempting to say he clicked on a box that there's no

25  record besides 2005, and this just goes to the weight of

1    whether that -- there is multiple agreements that are on

2    a later date.  Which doesn't seem to make sense, if

3    there's a -- a $10 fee if the agreement that he's

4    agreeing to is an old agreement when it was a $5 fee.

5           THE COURT:  Okay, point made.

6           MR. JONES:  Thank you.

7           THE COURT:  You can argue about relevance in

8    closing.

9      Q    (by Mr. Jones)  So I think, if we can flip to

10   page 8, same exhibit.  Which is the last page.

11     A    Mm hm.

12     Q    It kind of goes reverse chronology here, so

13   we're kind of going to the -- to the first term that Mr.

14   Soballe registered for in 2005.  And we see in the -- in

15   the left-hand column there, those are charges, and then

16   we see payments in the second column.

17     A    Mm hm.

18     Q    I mean, I think we'd have to go back to the

19   first page to actually see the -- the names of the

20   columns.  But -- and we see that there was charges for

21   that first term in 2005, and then there's payments, and

22   then there's some more charges for the next term, and

23   then there's payments.  And I believe it was your

24   testimony at your deposition, and I think we could look

25   at this form here and add up the numbers, but that Mr.

1  Soballe registered for classes in 2005, attended classes,

2  and then there was payments made from financial aid, or

3  from Mr. Soballe, and that his account was current.  And

4  then he'd register for classes again.  I think if we

5  looked at that form.  So there was points where he would

6  owe money, the tuition was always paid from 2005 and on,

7  correct?

8      A    Correct.

9      Q    So I'm just going to have you take a look at

10  the billing statements.

11          THE COURT:  Well, can we -- I have a couple of

12  questions about this document.  Why is the balance always

13  zero?

14          THE WITNESS:  So, right now his account is

15  sitting in write-off status, so we're not actively

16  collecting on it.  So he's got holds on his account that

17  prevent transcripts or registration.  But once -- since

18  we're not actively collecting on it, it doesn't have a

19  balance because we're not accruing fees on it.  So it

20  just kind of lives in a -- in a write-off status.  So

21  there -- there's nothing that would be outstanding on his

22  account.

23          THE COURT:  Okay.

24      Q    All right --

25          THE COURT:  And -- wait.  I'm -- okay, that's

1  all I had on this.

2          THE WITNESS:  Okay.

3      Q    (by Mr. Jones)  All right, Ms. DuPont, we're

4  going to go to the billing statements, which is Exhibit

5  G.

6      A    Mm hm.

7      Q    I'm going to have you flip through those

8  billing statements, I guess the first one, and we'll see

9  up at the right-hand top on the statement date it says

10 August 16th, 2010?

11     A    Yes.

12     Q    This -- this is a statement that was allegedly

13 sent to Mr. Soballe.

14     A    Yes.

15     Q    Correct?  And maybe if we could, I would also

16 have you flip to the Registration Guide, which is in

17 Exhibit H.

18     A    Mm hm.

19     Q    You can kind of look at that, because what I'm

20 trying to get to here is the -- the different dates when

21 there would be a percentage of the debt that would be

22 subtracted if the classes were dropped by the student at

23 that particular date.

24          So if -- if we look at Exhibit H, I think page

25 2 has that schedule for fall 2010.

1        A    Correct.

2        Q    So, and then if we can kind of flip back and

3    look at the statement from August 16th --

4             THE COURT:  Wasn't that for a summer class?

5        A    This would have been for summer term 2010.

6    Fall had not yet started.

7        Q    For this -- for this class.  Okay.

8        A    Yes.

9        Q    So let's -- let's go to September 20th

10   statement then.  The next one, next page.

11       A    Okay.  Yes.

12       Q    Okay.  So these are charges here for --

13       A    Fall term.

14       Q    -- fall term.

15       A    Mm hm.  Plus these accruing interest and

16   billing fees on the summer balance.

17       Q    Mm hm.  And so if we look at that schedule --

18   so this -- this statement was sent September 20th.

19       A    Mm hm.

20       Q    And if we look at that schedule there, up until

21   October -- it looks like October 4th, if he would have

22   dropped classes, he would have been eligible for a 70

23   percent reduction.

24       A    No.  As -- through midnight of the 3rd, he

25   would have been eligible for 100 percent.

1      Q    Through midnight of the 3rd.

2      A    Yep.  And as of the 4th, it was a 70 percent

3 refund.

4      Q    Okay.  So on -- on September 20th, he would

5 have been entitled still to a --

6      A    100 percent.

7      Q    -- 100 percent reduction.

8      A    Yes.  The term hadn't even started yet.

9      Q    Okay.  And then if we pan down to the bottom --

10     A    Mm hm.

11     Q    -- we see there's no notes about dropping or

12 the deadline and other things.  Is there anywhere there

13 that he would know that he would have been entitled to

14 100 percent refund?  We see charges.  Is there anything

15 on this statement that says where he would go to drop the

16 classes to receive the --

17     A    No.

18     Q    -- refund?  Or what the --

19     A    Not enough space.

20     Q    Or that if he -- or that he would have been

21 entitled to 100 percent refund?

22     A    No.  That's why we have the Registration Guide.

23     Q    Okay.  And if we flip to the next statement,

24 October 18th.

25     A    Mm hm.

1    Q    So, it's my understanding from the schedule,

2   and maybe I'm wrong, that he would have been eligible for

3   a 20 percent reduction on the date of this statement if

4   he would have dropped classes before then?

5    A    Yes.  As of that specific date, yes.

6    Q    And not to --

7    A    Started the 20 percent.

8    Q    -- not to be repetitive, but again, no

9   information about how to go about getting that 20 percent

10  reduction on those statements?

11   A    No.

12       MR. JONES:  No further questions.

13       MS. SINNOTT:  I just have one follow-up

14  question.

15       THE COURT:  Okay.

16

17                 **REDIRECT EXAMINATION**

18  BY MS. SINNOTT:

19   Q    Ms. Looney, earlier Mr. Jones asked whether you

20  agreed that data on the RCAP could be manipulated, I

21  think was the word that he used.

22   A    Mm hm.

23   Q    And I think you said yes, the student name and

24  signature could be manipulated.

25       You -- do you mean that the raw data could

1  change?  Not that you yourself could go in and manipulate

2  the data in the data warehouse.

3      A    Correct.  Because I have -- it's a read-only

4  database, I have no ability to change any of the

5  information.  It's just how the manipulation of how the

6  report appears could change some of that data.

7      Q    Okay.

8          MS. SINNOTT:  That's all I have.

9          THE COURT:  So, I think you said that there

10 were amendments to the RCAP --

11         THE WITNESS:  Mm hmm, correct.

12         THE COURT:  -- in 2010.

13         THE WITNESS:  Correct.  We -- yeah.  We have --

14         THE COURT:  So what changes were made and when

15 were they made?

16         THE WITNESS:  I do not have that on me, but we

17 have -- we have on occasions updated that form.

18         THE COURT:  So sometime in 2010 the form was

19 updated.

20         THE WITNESS:  Yes.  Updated, and then they also

21 went into the OAM process.  So how the acceptance

22 changed, as well.

23         THE COURT:  So that's when the -- the pop-up

24 comes up?

25         THE WITNESS:  No, the pop-up was coming before.

1  When it went into the OAM process in 2010 is when it

2  became part of the three documents that you accept every

3  six months.

4       Q    (by Ms. Sinnott)  But was it your

5  understanding that those two processes overlapped during

6  the time that Mr. Soballe would have registered for fall

7  2010?

8       A    Yes.

9       Q    So it was both the OAM process and the Banweb.

10      A    Correct.  For a period of about six months, I

11  believe.

12      Q    But the agreement and terms and condition were

13  the same during that time.

14      A    Correct.

15           THE COURT:  And can you look at Exhibit C?

16           THE WITNESS:  Yes.

17           THE COURT:  That's what would have popped up,

18  right?

19           THE WITNESS:  Right.

20           THE COURT:  In 2010 --

21           THE WITNESS:  Yep.

22           THE COURT:  -- this is what would have popped

23  up.

24           THE WITNESS:  Yes.

25  //

1          THE COURT:  And in order to register, you have

2    to accept.

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Okay, thank you.

5          MS. SINNOTT:  No further questions.

6          THE COURT:  Can this witness be excused?

7          MS. SINNOTT:  Yes.

8          THE COURT:  All right.

9          MS. SINNOTT:  I'd like to call Mr. Soballe.  I

10   don't know how mechanically you want to do this, if you

11   want to go first.

12          MR. FULLER:  Go ahead.

13          MS. SINNOTT:  Okay.

14          MR. FULLER:  No, that's fine.

15

16                   **JENS PETER SOBALLE**

17   called as a witness by the Creditor PSU, having being

18   first duly sworn, was examined and testified as follows:

19          THE COURT:  Please be seated, state your full

20   name and spell your last name for the record.

21          THE WITNESS:  Jens Peter Soballe, last name is

22   S-o-b-as-in-boy-a-l-l-e.

23          THE COURT:  All right.

24   //

25   //

1        **CREDITOR PSU'S DIRECT EXAMINATION**

2    BY MS. SINNOTT:

3        Q    Good morning, Mr. Soballe.  We're still barely

4    in the morning hours.

5        A    Good morning.

6        Q    Can you please turn to Exhibit F?

7        A    Okay.

8        Q    Page 4 of -- oh, let's see -- page 4 of 7,

9    please.  And I'm looking at summer 2009 quarter, do you

10   see that down at the bottom right-hand corner?

11       A    Yes.

12       Q    And you see there's a General Chemistry III

13   listed?

14       A    Mm hm.

15       Q    And an X right next to that?

16       A    Yes.

17       Q    Did you attend that class?

18       A    I couldn't tell you.

19       Q    Well, during your deposition you said that you

20   had attended the class --

21       A    Yeah.

22       Q    -- and I can actually read to you what your

23   testimony was.

24       A    Appears -- yeah, looking at it, it appears that

25   I probably did.  I passed a lab for that -- that Gen Chem

1   III.

2       Q    And I'll just quote for you from your

3   testimony.  You said that you attended that class for the

4   whole term.  Does that sound about right?

5       A    Yeah.

6       Q    Okay.  Yet you received an X on that.

7       A    Mm hmm.

8       Q    Okay.  Did you ever notify the Registrar or

9   Student Financial Services at PSU at any time during the

10  fall 2010 term that you were not attending those classes?

11      A    As far as like written communication, or --

12      Q    No, just communication.  Did you tell them?

13      A    I don't know if going on the Banweb website

14  would count as communication, but that's the only thing I

15  did.

16      Q    Did you -- so you -- you didn't call, email or

17  go in person to the Registrar's Office or Student

18  Financial Services during that term.

19      A    During fall of 2010, no.

20      Q    Okay.  So you said that you attempted to go on

21  Banweb and drop your classes, but there was a hold.

22      A    Yes.

23      Q    Do you recall what date you tried to do that?

24      A    I do not recall what date I attempted.  I know

25  that I attempted to drop the classes after I got

1  notification from FAFSA that I wouldn't be receiving any

2  more financial aid.

3      Q    Is it possible that that would have been after

4  October 20th, 2010?

5      A    I don't believe it was, I think it was before

6  that.

7      Q    Do you have --

8      A    I believe it was before I went to Haiti, is

9  when I tried.

10     Q    But is it possible that it was after you got

11 back from Haiti?

12     A    I suppose it's possible that my memory might be

13 faulted on the exact date, it was six years ago.

14     Q    Okay.  After you -- a hold was placed on your

15 account, and you tried, as you said, attempted to drop

16 online, did you ever go in person to the Registrar's

17 Office?

18     A    No, I was out of the country until the

19 reduction period was over.

20     Q    So it's safe to say you never went in person to

21 the Registrar's Office.  Did you ever call the

22 Registrar's Office?

23     A    No.

24     Q    Did you ever email the Registrar's Office?

25     A    Not in fall 2010.

1    Q    Did you ever submit any petition to PSU to

2  obtain a retroactive refund of your tuition?

3    A    No, I didn't know about that until these

4  proceedings occurred.

5         When I called the Registrar's Office after, I

6  never heard about it until the last two months probably.

7    Q    Other than this proceeding, did you ever file

8  any sort of lawsuit against PSU to make a determination

9  about your debt to PSU?

10    A    No, I just filed bankruptcy.  I listed them as

11  a debtor, I believe.

12         MS. SINNOTT:  Okay, I don't have any further

13  questions.

14

15                **DEBTOR'S DIRECT EXAMINATION**

16  BY MR. FULLER:

17    Q    Mr. Soballe, when did you first become a

18  student at Portland State University?

19    A    I believe 2005, fall of 2005.

20    Q    And did you complete that term in fall 2005?

21    A    Yes, I did.

22    Q    Do you recall the status of your account

23  balance at the end of the term of fall 2005?

24    A    It would have been paid in full.

25    Q    And remind us, how long did you attend Portland

1  State University as a student?

2     A    Well, if -- as of 2015, I -- ten years, I don't

3  know.  2010 was the last year that I attended any classes

4  at Portland State.

5     Q    Do you recall the status of your account

6  balance by the end of your summer term of 2010?

7     A    I had a few hundred dollars outstanding.

8     Q    Okay.  And you can't attend class if you owe

9  from the prior term, correct?

10    A    You can -- you can attend class if you owe, but

11  if you don't register before they put the hold on your

12  account, you can't register for any more classes, and

13  then you wouldn't be able to attend.

14    Q    So from fall 2005 to spring 2010, do you recall

15  the status of your account balance by the end of each

16  term?

17    A    I believe it was always paid in full so I could

18  continue attending classes.

19    Q    Did you ever attend any classes in the fall of

20  2010 at Portland State University?

21    A    No, I did not.

22    Q    Did you receive any credit for the fall 2010

23  term at Portland State University?

24    A    No, I did not.

25    Q    You explained earlier, but would you elaborate,

1  why didn't you attend?

2      A    So, every year, fall term, you have to submit

3  your application for student loans.  And I received a

4  determination from FAFSA that I would not be receiving

5  any more student loans, I wasn't eligible for any more

6  financial aid at that point.  So I -- I wasn't going to

7  attend classes that I couldn't pay for.

8           And then also, I was working as the Caribbean

9  Regional Coordinator for an NGO at the time, and I was

10  working in Haiti often.  Especially in fall of 2010.

11     Q    Did you attempt to drop your fall 2010 classes?

12     A    Yes, I did.

13     Q    How did you attempt to drop the classes?

14     A    I went on the Banweb student account, where I

15  typically would add or drop classes.

16     Q    Do you recall if you were ever made aware that

17  there might have been other options available to drop

18  other than how you registered for them, which was online?

19     A    No.  When you attempt to drop the class, it

20  tells you that there's a registration hold on your

21  account, but it offers you no other information at that

22  time.

23     Q    Would you please take out our pink binder, and

24  would you please turn to Exhibit 1?

25     A    Okay.

1    Q    Please look over Exhibit 1.

2    A    Okay.

3    Q    It's three pages, correct?

4    A    I have two -- oh yeah, the -- yeah.  Yes, three

5 pages.

6    Q    Do you recognize Exhibit 1?

7    A    Yes, I do.

8    Q    What is it?

9    A    It was an email sent to me by Megan Looney at

10 Portland State, and she sent me the RCAP that I had

11 requested per our conversation.

12    Q    And is the RCAP that you received the second

13 two pages of Exhibit 2?

14    A    Yes.

15    Q    Prior to requesting this agreement from Ms.

16 Looney, do you ever recall having seen it before?

17    A    No, I have never seen it before.  Which was

18 exactly the reason I requested it.  On the phone call,

19 she had told me that my debt was considered a student

20 loan because of the RCAP that I had signed, and that's

21 why it wasn't discharged in bankruptcy.

22    At which point, I requested her to send me a

23 copy of the agreement, because I never recalled signing

24 it.

25    Q    Do you ever recall having seen or accepted this

1  agreement online?

2      A    No, I just have the record that she sent me.

3  That was the only reason I knew about this agreement at

4  all.

5      Q    Do you recall accepting this agreement by

6  clicking a box online?

7      A    No.

8      Q    Did you ever receive a notice from Portland

9  State University that your billing charge had increased

10  from $5 to $10?

11      A    Not to my knowledge.

12      Q    Did you ever receive any student aid funds

13  directly from Portland State University?

14      A    No.

15      Q    Did Portland State University refer your

16  account to an outside collection agency after you filed

17  bankruptcy?

18      A    After the discharge was complete, yes.

19      Q    There was some talk of trans -- transcripts

20  earlier.  I want to be clear, after you filed bankruptcy

21  and received your discharge, did Portland State

22  University ever refuse to provide you your transcripts?

23      A    Repeatedly.

24      Q    No further questions, Mr. Soballe.

25  //

1          THE COURT:  So, is this your direct, as well?

2          MR. FULLER:  That's my direct, Your Honor.

3          THE COURT:  Okay.

4          MS. SINNOTT:  So, I have a couple follow-up.

5          THE COURT:  Yes.

6

7              **CREDITOR PSU'S CROSS EXAMINATION**

8    BY MS. SINNOTT

9      Q    So you just testified that you don't -- that

10   you never clicked a box to agree to the RCAP, is that

11   correct?

12     A    I don't recall ever clicking on a box to accept

13   the RCAP, no.

14     Q    So is it possible that you did click the box,

15   you just don't remember now?

16     A    Eleven years ago, yes, it's possible that I

17   don't remember something that happened eleven years ago.

18     Q    What about six years ago?

19     A    It's a long time.  It's a lot of days.  There's

20   a lot of clicky boxes in our world nowadays.

21     Q    Absolutely, I agree.

22          You testified on numerous occasions that PSU

23   has refused to provide your transcripts.  Have there been

24   circumstances where PSU has provided you transcripts,

25   despite your hold?

1       A       No.  That is not true.  No, I have not ever

2    received my transcripts from Portland State.

3       Q       Has Portland State sent your transcripts to

4    your employers per your request?

5       A       They have after repeated phone calls, yes.

6       Q       Okay.

7               MS. SINNOTT:  No further questions.

8               THE COURT:  Any follow-up?

9               MR. FULLER:  No.

10              THE COURT:  You may step down, thank you.  Oh

11   wait, I -- I have a question.

12              THE WITNESS:  Yes, ma'am.

13              THE COURT:  When did you go to Haiti?  And why

14   did you go to Haiti?

15              THE WITNESS:  There was an earthquake in Haiti

16   that leveled Port-au-Prince.

17              THE COURT:  Right, in January of 2010 --

18              THE WITNESS:  Correct.  So I --

19              THE COURT:  -- right?  And so when did you go?

20              THE WITNESS:  -- I went two weeks after the

21   earthquake originally.  I was directing a medical clinic

22   in Port-au-Prince.  And then I returned and I went four

23   more times that year, I believe.  And I was in Haiti from

24   October 9th through the 24th, on that particular

25   instance.

1      THE COURT:  Okay.  Did you go to Haiti again

2  after that?

3      THE WITNESS:  Yes.

4      THE COURT:  When?

5      THE WITNESS:  I have to check my passport.  I

6  can do that, I brought it with me.

7      (Pause)

8      March of 2011 and February of 2011, would have

9  been the next time.

10      THE COURT:  Okay.  All right, thank you.

11      THE WITNESS:  Thank you.

12      THE COURT:  Do you have any further witnesses?

13      MS. SINNOTT:  I don't.

14      MR. FULLER:  No, Your Honor.

15      THE COURT:  You're done?  Okay.  So what I

16  suggest is, we have to be out of here at noon, I'm sorry.

17  So what I suggest is that we break until -- when's your

18  hearing?  1:30?

19      MR. FULLER:  1:30.

20      THE COURT:  Let's break until 2, and you can

21  come back and do closing at 2.  All right?

22      MR. FULLER:  Thank you.

23      MS. SINNOTT:  Thank you, sounds good.

24      THE COURT:  All right.

25      (Recess)

1       THE CLERK:  Please rise.  Court is once again

2  in session, the Honorable Trish M. Brown presiding.

3  Please be seated.

4       THE COURT:  Go ahead.

5       MS. SINNOTT:  Should I go?  Okay.

6       THE COURT:  One-two-three go.

7       MS. SINNOTT:  And do you mind if I stay seated?

8       THE COURT:  No, I do not.

9       MS. SINNOTT:  Thank you, Your Honor.

10

11              **CREDITOR PSU'S CLOSING ARGUMENT**

12       MS. SINNOTT:  Your Honor, under 11 USC

13  523(a)(8)(A)(i), PSU must prove two things.

14       The first is that PSU is a governmental unit.

15  That fact has been stipulated to, I don't think that's in

16  dispute.

17       The second thing is that there was a contract

18  to which Debtor agreed -- the contract to which Debtor

19  agreed was an educational loan.

20       The evidence has shown that Mr. Soballe agreed

21  to the RCAP in at least two different ways in the summer

22  of 2010 preceding his registration for fall 2010 term.

23  First, before he was allowed to register online in the

24  Banweb system, he was required to quote-unquote "click

25  the box" as evidenced in Exhibit C, and second, before he

1   was allowed to change his password in OAM, he was

2   required to accept the RCAP terms.  This is in addition

3   to the times when he accepted the RCAP in previous terms.

4          Mr. Soballe has offered no evidence to the

5   contrary, that he has not -- that he did not click the

6   box and did not agree to the RCAP.  He simply says he

7   does not remember doing so.  So there should be no

8   question that Mr. Soballe agreed to the RCAP.

9          The question is whether the RCAP is a student

10  loan -- pardon me, an educational loan.  If you review

11  the RCAP that was linked to the click box, it shows that

12  the RCAP has all the ear-markings of a loan.  Because

13  there's no definition for educational loan in the

14  Bankruptcy Code, courts, including this circuit, have

15  adopted a relatively broad definition of "loan".

16         So it's a pretty flexible definition, and in

17  this case it's clearly a loan.

18         There are -- if you look at the terms and

19  conditions, there are required payments, there are

20  deferred payments, there are due dates, there are late

21  payment fees.

22         THE COURT:  Where -- where is all that?

23         MS. SINNOTT:  I'm sorry, in Exhibit D, page 2.

24  And this is identical to Exhibit A and Exhibit K.

25         THE COURT:  Okay.

1        MS. SINNOTT:  So there is -- there are deferred

2   chargements -- I'm sorry, deferred charges that are paid

3   in payments throughout the term.  So all payments must be

4   paid on or before the designated due date.  There are

5   late payment fees for not making the payments on time.

6   There are interest charges for -- on amounts that were

7   not paid within the grace period.  There are billing

8   charges.  There are collection costs.

9        In short, this document -- this RCAP in its

10  four corners has all of the ear-markings of a loan.

11  Because Mr. Soballe agreed to this, and because his

12  obligation was governed by this, there is no question

13  that his obligation to PSU is an educational loan.

14        The Debtor argues that there was not an

15  educational loan because he never attended classes and

16  therefore he never received an "educational benefit".

17  Setting aside the facts, which are he could have dropped

18  his classes but he didn't, the hold was not on his

19  account until well after the deadlines had -- had passed,

20  he could have gone to the Registrar, he could have called

21  and asked questions about how he could drop his classes

22  outside of the hold.  He never did so.

23        Regardless of that, it doesn't matter whether

24  he attended or he didn't attend his class.  The weight of

25  authority looks at the purpose test versus the use test

1  when considering whether -- whether and educational loan

2  is nondischargeable.  It does not matter whether or how a

3  debtor used the funds or the amounts advanced under a

4  loan to determine whether it's an educational loan.  What

5  matters is what the purpose of the loan was for.  And

6  that's established, if you read the *In re Maas* case, M-a-

7  a-s, 497 BR 863, it has a pretty good outline of what the

8  purpose test is versus use test.  It's -- it's

9  established that that test is what governs.

10         If the Court were to accept Debtor's argument

11  that because he never attended, it's not an educational

12  loan, it would be accepting the use test, because it

13  would look at, well, how was the loan used?  In this

14  case, it was not used by his choice.  He could have

15  attended all term.  His spot was open all term.  But that

16  is not the right analysis.  And for this Court to adopt

17  that analysis would go against the purpose test.

18         The cases that were cited in Debtor's trial

19  brief where the Court held there was no student loan are

20  distinguishable.

21         So the first one would be the *In re Hawkins*

22  case, so that's the 317 BR 104, and that's a Ninth

23  Circuit case from 2004.

24         In that case, the debtor had signed up for med

25  school in Ohio, had agreed to -- had gotten reduced

1  tuition in -- in exchange for agreeing to stay in Ohio

2  for five years after graduating, as a way to keep

3  students in the -- in the state so they can maintain

4  medical professionals there.

5      There was an agreement that the debtor signed

6  called a Contract of Admission.  And in that agreement,

7  the repercussions for not staying in Ohio for five years

8  was that the debtor was required to pay a form of

9  liquidated damages where they would look at what the cost

10  of subsidizing a medical student at the time of the

11  breach was, and they would charge that to the debtor.

12      In that case, the Court found that that was not

13  a student loan, and it was dischargeable because there

14  was no loan.  It had nothing to do deferred payments or

15  an extension of credit, it was a liquidated damages

16  provision.

17      And I have the Black's Law Dictionary

18  definition of "liquidated damages".  I think there is a

19  little bit of a misunderstanding about what that means.

20  Debtor's counsel has inferred -- or implied that in this

21  case there was liquidated damages because he never

22  attended.  But really what liquidated damages is, is it's

23  a measure of damages that is not actual damages.  In this

24  case, there's actual damages because you look at what did

25  he owe the University.  That's what their damages were.

1   That's how -- that was the measure of damages.

2         Liquidated damages is -- and you'll have to

3   forgive me for reading from this, but it is, "If the

4   parties to a contract have properly agreed on liquidated

5   damages, the sum fixed is the measure of damages for a

6   breach, whether it exceeds or falls short of the actual

7   damages." So it's a different analysis, it's a different

8   computation.

9         In the *In re Hawkins* case, that computation was

10  what it would cost for another med student's subsidy at

11  the time of the breach. It wasn't how much did that

12  debtor gain from entering into this admission agreement

13  as actual damages. So it's -- it's distinguishable.

14  It's just completely different from this situation.

15        Another case that I want to discuss is the

16  *Shojayi* case, *In re Shojayi*, I don't know if I'm

17  pronouncing that properly, but it's 515 BR 329 (D. Kan.

18  2014). Debtor cited this in his trial brief with a

19  parenthetical that said the Court held that there was no

20  student loan when the -- the student never attended

21  class.

22        Well, that case had nothing to do with whether

23  the student attended classes or not. And I think that

24  that's -- that parenthetical is misleading. So I want to

25  make sure that it's clear to the Court what that case

1 actually was about.

2          So, in that case, the -- it was a -- an

3 elementary school, and the parents for the elementary-age

4 students had agreed to a -- what was it called --

5 enrollment contract.

6          So basically they said, "We're going to enroll

7 and we promise to pay tuition."  Tuition was due in

8 advance, however.

9          So it was never that the school extended credit

10 to the parents.  The school just said, "You must pay in

11 advance.  And if you don't, there were some

12 repercussions."  There was no -- nothing about deferred

13 payments.

14          So the Court said, "Well, this isn't really a

15 loan.  They didn't extend credit.  It was just you agree

16 that you're going to pay a tuition in advance."  And it

17 had nothing at all to do with whether the students

18 actually attended class or not.  So, just want to clarify

19 that case, the parenthetical cited in that -- in their

20 brief is not correct.  Or at least is not -- is -- is

21 somewhat misleading.

22          Other cases -- and I won't go through all of

23 them -- but other cases that have held that -- that

24 agreements are not student loans generally look at timing

25 of the agreement.  So if the agreement is entered into

1    after the obligation is incurred, those are generally not

2    considered educational loans.  It has to precede the

3    agreement.  In this case, we have that.

4          I'm sorry, the agreement has to precede the

5    attendance at the school.  Or they have some other

6    measure of damages, like liquidated damages, which we

7    don't have here.

8          So, finally, you know, you're well familiar

9    with *In re McKay*, it was your case, went to the Ninth

10   Circuit.

11         The Debtor's lawyers are going to make a big

12   deal of one specific line in that case about how the --

13   the amount of the loan has to be the actual benefit

14   received.  I -- I think that they're taking that

15   statement out of contact -- context.  I think what the

16   issue was, was the loan itself didn't have an amount

17   listed in it, so the parties fought over, "Well, it

18   doesn't have this amount listed.  It's not a loan if it

19   doesn't have an amount listed."  And the courts -- all

20   three of the courts, you, the District Court and the

21   Ninth Circuit, said, "Well, that doesn't really matter,

22   because you can look to the tuition schedules and figure

23   out what it is that the debtor owes."  So that was not

24   dispositive.  And I don't think that because that

25   specific sentence is in the case, it changes the analysis

1  here.  I still think we have to look at the purpose test

2  not the use test.  And I don't think that it matters

3  whether he attended class by his own choosing.

4          The other case that they're going to talk about

5  is *In re Johnson*.

6          Again, there is for me an unfortunate sentence

7  in there that says that the debtor in that case -- in

8  that case the Court held that it was a student loan, but

9  they said the debtor agreed to pay tuition in advance of

10 starting and then drew upon the line of credit by his

11 attendance to the class.  That was just one piece of many

12 pieces of that paragraph.  It wasn't the only thing that

13 the Court was looking at, whether he actually attended,

14 it was just one of the reasons why the Court said, "Well,

15 this is a loan, and I'm going to have -- I'm going to

16 give an expansive reading of what 'loan' means."

17         So, that's all I have.  Do you have any

18 questions?

19         THE COURT:  No, I don't.

20

21              **DEBTOR'S CLOSING ARGUMENTS**

22         MR. JONES:  So I'm going to start off by just

23 going back to the beginning, in the opening, in a few

24 sentence of why -- what Debtor thinks are the key issues

25 here.

1          So on 523(a)(8)(A)(i), this debt must be

2     considered a loan in order to be held nondischargeable.

3          In the Ninth Circuit -- in this Court and in

4     the Ninth Circuit, we have *McKay* and we know that the

5     definition of loan has been extended to include some

6     tuition debts, or deferred tuition debts, where there's

7     an agreement between the student and the creditor setting

8     forth the terms and conditions that's effective as to

9     that particular debt, including certain terms and

10    conditions like the date certain for repayment, and (3)

11    where there's an actual benefit received by the debtor

12    resulting from the debt.

13         And I think that's clear in the case law, and

14    I'll talk more about that.

15         So to summarize, we think the central issues

16    are, is there a valid and enforceable agreement that

17    pertains to the 2010 tuition debt?

18         And the second question, did Mr. Soballe

19    receive an actual benefit from the tuition debt?

20         And I think the evidence presented here today

21    clearly shows that the -- the answer to both of these

22    questions is no, and thus the tuition debt to PSU is

23    discharged in Mr. Soballe's bankruptcy.

24         So starting off with whether there's a valid

25    enforceable agreement that was effective as to the 2010

1   tuition debt.

2          PSU originally presented evidence to this Court

3   of a 2005 agreement that it felt was very relevant, that

4   had an e-signature and a particular date showing when Mr.

5   Soballe assented to this agreement.

6          Since submitting that 2005 agreement, discovery

7   and -- and testimony here today has shown that actually,

8   well maybe there was multiple times throughout his

9   relationship with PSU that he had assented to a blank

10  version, at least, of a -- what they call an RCAP, or an

11  agreement.

12         So how can they show that assent to that 2005

13  agreement?  We -- we have a flowchart and -- and

14  apparently Mr. Soballe was required to click on a box

15  that says he agreed to certain terms and conditions, and

16  then there was another hyperlink that -- that said "click

17  here" that he would go to the actual agreement and read

18  those terms if he so chose.

19         And so PSU submitted this actual e-signed

20  document, which I think is very unclear how the e-

21  signature actually is manifested on the document, how the

22  date is manifested.  I don't think there's real evidence

23  of what that was or how that came to be.  We have two

24  different versions that were presented of this agreement,

25  which I understand that the -- the Court does not believe

1   are substantive, and we would agree with that.

2          But I think the relevance of those two

3   different versions is that -- that we are supposed to

4   believe that they have met their burden of proof that he

5   assented -- that Mr. Soballe assented to the agreement by

6   showing what this e-signature is, but yet we have two

7   different versions of this document that came from the

8   database that have -- whether they be substantive

9   differences in the terms and conditions, I think goes to

10  show that this document itself and how it was stored and

11  what we see here isn't -- isn't trustworthy, or should be

12  given little weight in terms of Mr. Soballe assenting to

13  that agreement in 2005.

14         In terms of the other alleged agreements or

15  times that he "clicked the box" so to speak, when he

16  changed his password and was then agreeing to another

17  agreement, that would supplant the -- the earlier

18  agreement.

19         And we have PSU stating that as late as 2015,

20  just last year, five years after he was a student, that

21  he was agreeing to a blank RCAP agreement.  Which -- and

22  even reading through the language of the RCAP agreement,

23  any sensible reading of that, if a -- if a student were

24  to look at that, you'd be agreeing to something when you

25  haven't registered for classes in -- in five years.

1          Additionally, this copy of the agreement still

2     states the old billing charges of -- of $5.  So if he's

3     agreeing in 2015 to this old agreement of $5, why was he

4     being charged $10?

5          I think as I said earlier, that goes to show

6     that they have taken their burden very lightly to show

7     that there was an agreement formed and that Mr. Soballe

8     assented to that agreement.  And they've just simply

9     produced one agreement that clearly doesn't control --

10    they concede it doesn't control, from 2005.  They can't

11    produce any other agreement.  There may have been an

12    agreement in 2007 that actually he signed, but they

13    weren't able to produce that.  He may have clicked on the

14    box, you know, five or seven times since then, I think if

15    I could go back and count, as late as 2015, and maybe

16    those are the agreements that control.

17         They've stated that the agreement was amended

18    sometime in 2010.  They haven't produced that agreement.

19    But yet if he agreed to this agreement by clicking on the

20    box as late as 2015, that agreement was not even before

21    the Court of what the terms and conditions of that

22    agreement are.

23         So it's Debtor's position that PSU simply

24    hasn't met its burden that Mr. Soballe assented to any of

25    these RCAP agreements.

1    And what we do know from *McKay*, going back to

2    those -- to those elements, is that there has to be a

3    valid and enforceable agreement.  And they haven't met

4    their burden.  If there's no agreement, then it's not a

5    loan.

6        In terms of the definition of loan, as I said,

7    it's -- it's clear that this Court and the District Court

8    and the Ninth Circuit and other courts have expanded the

9    definition of a loan.  A traditional loan, of course, is

10   when there's money exchange hands.  That, you know, a

11   creditor agrees to -- to give a loan of $20,000 and

12   either that goes to the university or it goes to the

13   student and he pays his educational expenses with that.

14       THE COURT:  But, if that were true, you could

15   never have a loan that was made by a university, right?

16   You're not arguing that, are you?

17       MR. JONES:  No, I'm -- I'm not actually.  I

18   think that we -- we concede that there -- there are some

19   times that a -- a tuition debt like this could be a loan.

20   But those parameters and those elements necessary for it

21   to be a loan are exactly that, they're necessary.  Right?

22   We need to have this agreement with those definite terms,

23   right?  If we don't have that, then it can't be a loan.

24       And the -- the actual benefit received, I think

25   is just simply clear.  Opposing counsel points to those

1 cases says, "That wasn't that issue in that case." Well,

2 no, it wasn't, because in each of those cases, including

3 in this Court, a finding was made that the student used

4 the account.

5        And -- and as far as *McKay*, the account was

6 actually -- it could be used for all sorts of things

7 including, you know, tuition, for books, for vending

8 machines, for dining and for meals. And the student did

9 use that account.

10        So of course it wasn't an issue, that wasn't

11 the exact issue decided in *McKay*. Nor was it the issue

12 that was decided in *Johnson*, nor was it the issue that

13 was decided in *Hawkins*, because the findings were all

14 clearly made.

15        In *Hawk* -- in *Hawkins*, she had received her

16 medical -- medical degree. There was no argument that

17 she didn't get the training.

18        In *McKay*, it was clear that the -- that McKay

19 had used the account for all sorts of things, tuition,

20 books and food and -- and whatnot. And the same as in

21 *Johnson*.

22        And so, yes, the Court didn't decide it on that

23 issue because it wasn't present. But nonetheless, it is

24 a necessary element. And I think common sense tells us

25 why it's a necessary element. Because although that

1  definition of "loan" has been extended to say -- to a

2  tuition debt where no money exchanged hands because

3  you're agreeing to pay for something, for some services

4  at a later date.

5        If you take out that final pillar there, that

6  pillar of actual benefit, then it stretches the

7  definition of "loan" beyond any tenable meaning

8  whatsoever.  It would be -- it would give it more

9  protection than a -- than a traditional loan would have.

10 Because the actual benefit received and the consideration

11 for a loan is that $20,000 going from the creditor to the

12 -- to the university or to the student.

13       If that $20,000 never gets paid anywhere then

14 there's no loan.

15       And -- and if you take that pillar of having an

16 actual benefit out of this expanded definition of loan,

17 then it's just simply not a loan.  And that's why the

18 court -- the various courts that have decided this made

19 sure to make findings that there was an actual benefit

20 received in order to be considered a loan.

21       I think maybe an analogy -- a common analogy

22 would be that if Mr. Fuller and I agreed that, you know,

23 I'd rent his office space out for $100 on some day for an

24 hour, right?  And we had an agreement to do so.  And then

25 I never show up, I never use his office space.  Mr.

1  Fuller uses -- uses the office space, and then he comes

2  and he says, "Mr. Jones, I loaned you $100.  You owe me

3  $100 because I loaned you $100."  Fine, there may be a --

4  a breach of contract there because I didn't show up, and

5  it said if I didn't that I would be charged $100.  But if

6  he used his office, there's -- there's no way that that

7  can be considered a loan because there was actually no

8  benefit received.  That's the importance of the actual

9  benefit received.

10       Then opposing counsel refers to educational

11  benefit.

12       I think those cases that she's citing, if I'm

13  correct, are -- are not addressing this issue of actual

14  benefit when we're talking about the definition of a

15  loan.  Just, in those cases, the student, you know, went

16  and got the -- the education -- they're arguing that

17  there's no educational benefit, meaning it was -- it was

18  useless to them.  This is a separate thing here, this is

19  just this element of actual benefit when we're talking

20  about where no money exchanged hands and there's a

21  deferred agreement to pay tuition later.

22       And the evidence has shown, Mr. Soballe

23  testified that he -- he did not even attend one single

24  class.  He attempted to drop those classes online but it

25  was difficult for him to do so.  Because of the

circumstances and also because, quite simply, of all of the statements and bills and such that Mr. Soballe received, it was never made clear to him that there was another way to -- to drop classes.

And even if he would been made aware of that, then it -- it seems pretty clear that the -- the two different forms that he would have had to fill out, they say right on there that they have to be returned in person.  So he would've actually had to be here.

Now I don't think that -- we're not arguing that really a loss to -- an economic loss to PSU is really relevant at all, because it's an actual benefit received by Mr. Soballe, and there clearly was no benefit.  He got no credit from the classes.  He didn't attend the classes.

In fact, it's been nothing but a detriment to him, not a benefit.  He has been -- PSU has been pursuing this debt from him, they've garnished his tax returns. He's had trouble getting transcripts.  I don't see that there's any way or any facts here that can meet that element where Mr. Soballe received an actual benefit in order for this to be a loan.

And I think to -- to not have that element in here really -- really defies logic as to what the definition of "loan" is, even under -- under *McKay*, under

1 | *Johnson.*

2 | And opposing counsel did point out the -- the

3 | troubling sentences, as she called them, but I don't see

4 | them so much as troubling as actually just the law there

5 | and the importance of those elements. And maybe I'll

6 | just read a few of them, although she -- she covered them

7 | pretty -- pretty well.

8 | So in *McKay*, the sentence is, "The amount due

9 | on the loan must reflect the amount of the benefit

10 | received."

11 | In *Hawkins,* where it says, "In order to fall

12 | within the definition of a nondischargeable debt under §

13 | 523(a)(8), the loan instrument must sufficiently

14 | articulate definite repayment terms and the repayment

15 | obligation must reflect the value of the benefit actually

16 | received."

17 | In *Johnson*, which the Ninth Circuit in *McKay*

18 | relied on heavily as -- as persuasive authority, the

19 | sentence that opposing counsel said was troubling says

20 | quite clearly that, "The debtor signed a promissory note

21 | to evidence her debt. By allowing Johnson to attend

22 | classes without re -- prepayment, the College was, in

23 | effect, 'advancing' funds or credits to Johnson's student

24 | account. Johnson drew upon these advances through

25 | immediate class attendance." So therefore, it is

immaterial that no money actually exchanged hands.

That underscores the importance of that element of the actual benefit when we're not talking about a traditional loan. When we're just talking about an agreement to pay something later. Congress could have very well used -- when they amended the Bankruptcy Code, they could have used the word "student debt." They didn't use the word "student debt." They -- in this particular case, we now show it's got to be a loan. That was an intentional choice of Congress. And although that definition has been expanded to include situations when money changed hands, it was still very important that that -- that element of there's an actual benefit received is there in order to determine that it's a loan.

So to conclude, because PSU has not met its burden to show that Mr. Soballe assented to really any agreement, that is specifically an agreement that was in effect at the time of the 2010 classes -- which, by the way, I skipped over a point in the -- the actual 2005 agreement clearly stating on its face that the agreement would no longer be in effect after there was no outstanding account balance. Which there was -- there were many times throughout since 2005 there was no account balance. He had a zero account balance up until 2010. So clearly, the 2005 agreement can't possibly

1 control as to the 2010 debt.

2         THE COURT:  Well, what about the language in

3 the -- in the Registration Guide that says, "Completely

4 dropping all courses does not cancel a student's

5 obligation to pay a student loan or the balance of a

6 revolving charge account."  And I'm looking on page 18.

7         MR. JONES:  Of the -- in the Registration

8 Guide?

9         THE COURT:  H, right.

10         MR. JONES:  So one, there's absolutely no

11 evidence that, I mean, this was even given to students,

12 that he would have ever even read this.  I mean, it's

13 available at the bookstore or online.  So there's no

14 evidence of that.  But what page, Your Honor?

15         THE COURT:  18.

16         MR. JONES:  So you're saying it references the

17 --

18         THE COURT:  "Dropping all courses" -- I'm

19 looking at the top.

20         MR. JONES:  All right.

21         THE COURT:  "Students with outstanding" -- so

22 the very first sentence.

23         MR. JONES:  Mm hm.

24         THE COURT:  "Completely dropping all courses

25 does not cancel a student's obligation to pay a student

1  loan or the balance of a revolving charge account."

2      MR. JONES:  Mm hm.  I -- I actually think that

3  the -- I don't understand that sentence myself, because

4  we -- we know from their testimony that if -- if students

5  were to drop courses at least for that term, up until a

6  certain date there a hundred percent refund.

7      THE COURT:  Yeah, and then there's -- tuition

8  refund policy is right under that.

9      MR. JONES:  Yeah.  Right.  But yet on this --

10     THE COURT:  Right, but you're -- but it seems

11 to me that at least he was on notice he needed to do

12 something more than just attempt one place.

13     MR. JONES:  So if -- if what I understand the

14 argument is by -- it's relevant to determine whether it's

15 a loan whether he made sufficient efforts to -- to drop

16 the classes.  I mean, I don't --

17     THE COURT:  All right, I'm just wondering if

18 that's -- to me that's sort of relevant, he didn't do

19 much to sort of try and take care of this.

20     MR. JONES:  Again, I think that -- that's in

21 our brief and we're arguing that because opposing counsel

22 is going out of their way to argue that.  I think that,

23 you know, to -- to whatever extent it's relevant, he

24 tried to drop online, that's how he registered, there's

25 no indication he would have ever actually read this

1    Registration Guide, that he was ever even provided with

2    one in the first place.

3            And still, I mean, with all this language in

4    this agreement, there's many pages of it, it doesn't say

5    how to actually drop -- there's a lot about how to

6    register for the classes and what you're going to owe and

7    what fees you're going to owe and -- and things like

8    that, but there's nothing in here to say, you know,

9    "We're going to put a hold on your account.  If we do,

10   this is, you know, go into the registration's office,

11   there's these forms."  They could have put the forms in

12   here, how to drop the classes.

13           I think the point is, is they -- they're kind

14   of hiding the ball on -- in terms of making it easy for

15   someone to drop classes.

16           As soon as they owe any money, essentially,

17   they -- they put a hold on there so you can't easily drop

18   their -- drop the classes, making it more difficult,

19   making it more likely that a student like Mr. Soballe

20   wouldn't be able to drop the classes in time to get a

21   refund.

22           And I say refund in quotes, because, you know,

23   really it's just a reduction in the debt that PSU is

24   going to pursue from them.  There's no money that's going

25   to be given back to -- to them based upon this.  Because

1  the argument is, it's not really a loan.  They set it up

2  to look like a loan, because 523(a) says it's got to be a

3  loan.

4          But, you know, the evidence shows that when a

5  student owes any money, they're not going to be allowed

6  to register for classes.

7          That happened with Mr. Soballe because I think

8  he registered early, he was allowed to register for a

9  term when he owed a couple hundred bucks from the term

10  before.

11          Otherwise, they would have shut him -- shut him

12  down and he wouldn't have been able to attend any

13  classes.

14          It's not -- it's not really a loan.  It's a

15  tuition debt that they want to make sure that they're

16  able to pursue when people file bankruptcy.

17          And if we look at those -- the Revolving --

18  it's called a Revolving Charge Account Agreement, but

19  they can't charge anything on it really.  If we look at

20  the agreements in -- in *McKay*, that's a revolving charge

21  account agreement.  The student could go use this thing

22  to -- to charge tuition and books and food and such, and

23  they did.

24          And again, the courts made a showing, and that

25  was an important showing in those cases.  The reason it

1  wasn't an issue is because it clearly, they received an

2  actual benefit from it.

3          But really, this is nothing more than a -- than

4  a one-term debt that we owe to PSU, and -- and -- called

5  a Revolving Charge Account Agreement, so that they can

6  try to meet the definition of a loan.  And I think the

7  facts in this case, we can see that.

8          I mean, I think the law is quite clear about

9  it.  This Court has decided that, the Ninth Circuit,

10  that, you know, an extended tuition deferment, that can

11  be a loan.  But those -- it's very important that each of

12  those elements are met, or we're just extending that

13  definition of loan far too broadly and it just wouldn't

14  make any sense anymore.  There's actually no

15  consideration then for it to be, it had more protection

16  than an -- than an actual loan, where money exchanged

17  hands.

18          THE COURT:  Okay.  Well, I'm not going to rule

19  from the bench.  I know that is my normal practice, but I

20  am not going to do that today.  I may call you back or I

21  may issue a written opinion.

22          I know you had some attempts at settlement.  I

23  think you both have risks.  I think there's a good reason

24  to attempt to settle this again.

25          And I will tell you that I am going out of the

1 country next Wednesday, and I will be gone for the better

2 part of -- well, I'll be gone more than two weeks, and

3 back for a very short period of time, and then out of the

4 country again. So it's unlikely that you're going to get

5 a decision for the next month.

6          MR. JONES:  Where are you going?

7          THE COURT:  Ecuador and Peru.

8          MR. JONES:  Mm.

9          THE COURT:  For a momentous birthday.  And then

10 Germany with my assistant, who has qualified for the

11 Veteran World Championships in Fencing, and I am going as

12 her Sherpa.

13          MS. SINNOTT:  Your Honor, before we adjourn,

14 can I just address three points very quickly from his --

15          THE COURT:  Okay.

16          MS. SINNOTT:  I will be so fast.

17          The first one, I just want to make sure that

18 the record is clear that PSU has met its burden on

19 proving that an agreement exists.  And it's not through

20 the 2005 exhibit, but it's through the data that is in

21 Exhibits E and B, as put on the record through Ms.

22 Powell's testimony.

23          The second thing I want to address is that the

24 Debtor did receive an actual benefit from this extension

25 of credit, and the benefit was that he was permitted to

1   register for classes and allowed to attend them all term.

2   He chose not to.

3        And if you look at the language in the *McKay*

4   case from the District Court, the Court noted that in

5   that case the educational benefit to debtor was that she

6   could start paying classes -- could start classes without

7   paying tuition up front.  That happened here, as well.

8   He chose not to attend, but he could have attended.

9        The one last thing I want to address is --

10       THE COURT:  I'm kind of grumpy about --

11       MS. SINNOTT:  I'm sorry.

12       THE COURT:  Just to let you know, I'm kind of

13  grumpy about the fact that he couldn't withdraw online.

14  Even though he could sign up online, he couldn't withdraw

15  online.  And there's -- I don't know, I'm going to look,

16  that's one of the reasons why I'm not ruling from the

17  bench, but there's like not sort of explicit instructions

18  about, "Okay, you want to -- you want to not come, you

19  need to do X, Y or Z."  And yes, I get that he could have

20  gone in, and I get that he could have sent an email.  But

21  that's not very explicit anywhere, even in the language

22  that I read from -- from the -- from, you know, dropping

23  courses or whatever, right?

24       If he got frozen out of the system because he

25  owed money from the summer of 2010, how does he, you know

1  -- so I'm -- and -- and I told you, I have had concerns

2  about that particular issue from the very beginning of

3  this case.  So just letting you know.

4        MS. SINNOTT:  And I understand that.  One of

5  the -- one thing that we put on today, though, was that

6  his hold was not effective until October 20th, which was

7  well after the term started, and well after he

8  registered.  So he could have dropped online.  And he's

9  claimed that he -- he tried to before he left for Haiti,

10  but he says he can't remember one way or another.  And we

11  have evidence in the record, through the testimony of Ms.

12  Looney, that the hold was not there until October 20th.

13        THE COURT:  Okay.

14        MS. SINNOTT:  So I think he could have dropped,

15  he just chose not to.

16        But I appreciate that, and I understand that is

17  an issue for you.

18        And then the -- the third thing I want to

19  address just very quickly is that there is a case, *In re*

20  *Barth*, 86 BR 146, and it's a case where a father co-

21  signed on an educational loan and the father was the

22  debtor.  Father argued that he received no educational

23  benefit or no benefit at all from the loan.  And the

24  Court said that was not dispositive, because it looked at

25  what the purpose of the loan was.  So, I just want to

1   make sure that's on the record.

2           And I have nothing further to add.

3           THE COURT:  Okay.

4           MS. SINNOTT:  Enjoy your trip.

5           MR. JONES:  If I can, I guess, follow up with

6   one more.

7           I -- I think, again, if we -- if we look at

8   those cases, and I -- and I agree that the last time I

9   read the District Court, and I think Judge King's opinion

10  in *McKay*, he did discuss the educational benefit.  The

11  Ninth Circuit did not pick up on any of that in its

12  decision, I think for a reason.

13          And I think the -- the case that opposing

14  counsel's referring to, again, is -- it's a different

15  thing, we're not talking about educational benefit.

16          If there was an agreement here, and he would

17  have benefitted in any way, like any actual benefit by

18  going to the classes, then yeah, it was for an

19  educational benefit, it was at a university.  Even if he

20  would have used any of the funds for -- for tuition,

21  books or anything else.  I -- I don't think that the

22  issue here is educational benefit.

23          Opposing counsel keeps repeating essentially a

24  predetermined sentence, right?  That -- that it's an edu

25  -- it's an educational loan because the purpose of it was

1    -- the -- the distinction here is whether it's a loan in

2    the first place. Right? And the purpose of it, I -- I

3    think is really not important, not what we're arguing.

4          If there was an agreement, and if he had

5    actually received any benefit, surely it was for an

6    educational purpose. It's just whether it's a loan. And

7    -- and I think you need that actual benefit, I think it's

8    clear as to why you need that actual benefit. And I

9    think the case law is quite clear in each of those cases,

10    the Court made those findings for a reason, that there

11    was an actual benefit received, and that's what -- that

12    made that necessary element to -- to call it a loan.

13          THE COURT: And there's no case out there about

14    where someone who didn't matriculate, right?

15          MS. SINNOTT: I have not found a case.

16          MR. JONES: Not that I've -- not that we've

17    found.

18          THE COURT: That's unfortunate.

19          MS. SINNOTT: Yeah, that would be helpful.

20          MR. JONES: So -- so in one way, you may be the

21    only judge to either decide that a student that received

22    arguably no benefit whatsoever, it was still a

23    nondischargeable loan, or the first to decide that, in

24    this case, unlike those other cases, where there was no

25    actual benefit, that it's not a loan.

```
1              THE COURT:  Was there anything left -- and
2   maybe I can tell this from the record, but was there
3   anything left owing from the summer 2010 loan?
4              MS. SINNOTT:  Yes.
5              MR. JONES:  Yes.
6              THE COURT:  Which clearly was a loan, right?
7              MR. JONES:  Well, I -- I don't want to get into
8   semantics of now that I don't understand where -- where
9   the agreement even comes from from the 2009, but you
10  know, outside -- outside that --
11             THE COURT:  He went to classes --
12             MR. JONES:  -- you know, he got a benefit.
13             THE COURT:  -- in the summer of 2000 --
14             MR. JONES:  Yeah.  Yes.
15             THE COURT:  -- that we're -- we're only talking
16  about the fall classes of 2010, right?
17             MR. JONES:  In terms of the actual benefit,
18  yes.
19             THE COURT:  Not the summer.
20             MR. JONES:  Yes.
21             THE COURT:  Right?  So, and there was still
22  something left over from that, right?
23             MR. JONES:  Yeah, a couple hundred dollars,
24  assuming there was --
25             MS. SINNOTT:  Yes.
```

1           MR. JONES:  Yeah, but I mean, it does

2    presuppose that, assuming there was the first element

3    where there was an agreement to pay that 2009 debt.  But

4    outside of that, if we're talking about actual benefit, I

5    agree, there was --

6           THE COURT:  He went to class.

7           MR. JONES:  -- there was benefit for the $200

8    or whatever it was from the term before.

9           THE COURT:  And -- okay.  I think I'm good.  I

10   will get you a decision as quickly as I can.  I do not

11   like to keep things under advisement.  Right?  Thank you

12   very much.

13          MS. SINNOTT:  Thank you.

14          MR. JONES:  Thank you, Judge.

15          MR. FULLER:  Thank you, Judge.

16          (Adjourned)

17

18

19

20

21

22

23

24

# DECLARATION OF TRANSCRIBER

I, Robyn M. Anderson, hereby certify that:

a.    I am an Official Transcriber for the State of Oregon;

b.    that I personally transcribed the electronic recording of the proceedings had at the time and place herein before set forth;

c.    that the foregoing transcript totaling 147 pages of audio transcription, including cover pages and index, represent an accurate and complete transcription of the entire record of the proceedings, as requested, to the best of my belief and ability.

WITNESS my hand at Gresham, Oregon this 10th day of November, 2016.

_____
Robyn M. Anderson, Transcriber
robyntype@gmail.com
(503) 618-9938