IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | Case No. 11-40345-tmb7 |
| | ) | |
| Jens Peter Soballe, | ) | Portland, Oregon |
| | ) | November 3, 2016 |
| Debtor. | ) | |
| | ) | Final Hearing on Motion |
| _____) | | For Contempt (Ruling) |

**TRANSCRIPT OF PROCEEDINGS**

Before the Honorable Trish M. Brown

United States Bankruptcy Judge

Appearances of Counsel:

For Debtor                      Michael Fuller
                                OlsenDaines PC
                                US Bancorp Tower 31st Fl
                                111 SW 5th Ave Ste 3150
                                Portland OR  97204

                                Kelly Donovan Jones
                                Law Office of Kelly D Jones
                                819 SE Morrison St Ste 255
                                Portland OR  97214

For Creditor PSU                Jeanne Kallage Sinnott
                                Miller Nash Graham & Dunn
                                111 SW 5th Ave Ste 3400
                                Portland OR  97204

**Transcribed From Electronic Recording By:**
*Robyn M. Anderson, Transcriber*
*3351 SW Redfern place*
*Gresham, Oregon  97080 (503) 618-9938 email: robyntype@gmail.com*

1                                              **November 3, 2016**

2                                                   **9:01 a.m.**

3                                                **(Judge Brown)**

4                        **P R O C E E D I N G S**

5                           **COURT'S RULING**

6                        **(Motion for Contempt)**

7          THE COURT:  Good morning.  This is --

8          MR. FULLER:  Good morning.

9          THE COURT:  -- this is the time set in the Jens

10   Soballe, case number 11-40345, for a ruling on the motion

11   for contempt.  Well, one issue in the motion for contempt.

12          This matter came before the Court on the motion

13   of Jens Peter Soballe, the Debtor, who seeks an order

14   finding Creditor Portland State University, PSU, in

15   contempt for violation of the discharge injunction of 11

16   USC § 524(a)(2).

17          The parties have agreed that the Court must

18   first address the threshold question of whether the claim

19   held by PSU is a nondischargeable student loan.

20          The Court held an evidentiary hearing on

21   September 8th, 2016.

22          In reaching my decision, I have considered the

23   evidence and arguments presented at the hearing, and have

24   carefully reviewed both parties' memoranda in support and

25   in opposition to the Debtor's Motion.

1        I also read applicable legal authorities, both

2    as cited by the parties and as located through my own

3    research.

4        The following findings of fact and legal

5    conclusions constitute my findings under Federal Rule of

6    Civil Procedure 52(a), applicable through the Federal

7    Rules of Bankruptcy Procedure 7052 and 9014(c).

8        To the extent any of my findings constitute

9    conclusions of law, they are adopted as such.  To the

10   extent any conclusions of law constitute findings of fact,

11   they are adopted as such.

12       Facts.  Based on the evidence received, I find

13   the following facts are not subject to serious dispute.

14       The parties agree that PSU is a governmental

15   unit of the State of Oregon.  Debtor first enrolled as a

16   student in PSU in the fall of 2004.  Hearing Exhibit F at

17   3.

18       Sometime in 2010, Debtor registered to take

19   classes at PSU during the fall term 2010.  Statement of

20   Agreed Facts, ECF No. 36, paragraph 1.  PSU agreed to let

21   the Debtor pay his fall 2010 student account balance over

22   time, but Debtor did not pay the balance in full.

23       On December 6, 2011, Debtor filed a voluntary

24   Chapter 7 petition.  ECF No. 1.  He received a discharge

25   on March 12, 2012.  ECF No. 10.

1          Debtor and PSU dispute several facts, including

2    whether a contract was formed, the efforts Debtor took to

3    drop his fall 2010 courses, and whether the Debtor

4    attended any class sessions.

5          Legal standard.  Section 523(a)(8) of the

6    Bankruptcy Code specifies that student loans are

7    nondischargeable unless repayment would unconstitute an

8    undue hardship.  In student loan dischargeability

9    disputes, "The lender has the initial burden to establish

10   the existence of the debt and that the debt is an

11   educational loan within the statute's parameters.  The

12   burden then shifts to the debtor to prove undue hardship."

13   *Roth v. Educational Credit Management Corp. (In re Roth)*,

14   490 BR 908 at 916-917 (9th Cir. BAP 2013).

15         PSU claims that the Debtor's unpaid balance is a

16   nondischargeable student loan under section

17   523(a)(8)(A)(i), which as relevant here, applies to, "an

18   educational loan made, insured or guaranteed by a

19   governmental unit."

20         Under this statutory provision, a student loan

21   need not involve the actual transfer of money, but must be

22   governed by a loan instrument that sufficiently

23   articulates definite repayment terms, and the repayment

24   obligation must reflect the value of the benefit actually

25   received.  *Ohio University v. Hawkins (In re Hawkins)*, 317

1  BR 104 at page 110 (9th Cir. BAP 2004).

2  Other courts have reached results similar to the

3  holding in *Hawkins*.  For example, the Seventh Circuit

4  Court of Appeals has held that nonpayment of tuition

5  qualifies as a loan in two classes of cases:  where funds

6  have changed hands or where there is an agreement whereby

7  the college extends credit.  *In re Chambers*, 348 F.3d 650

8  (7th Cir. 2003) (citations omitted).

9  The Sixth Circuit has held that a loan under

10  523(a)(8) can include an extension of credit if the

11  student -- "(1) the student was aware of the credit

12  extension and acknowledges the money owed, (2) the amount

13  owed was liquidated, and (3) the extended credit was

14  defined as a sum of money due a person." *Andrews*

15  *University v. Merchant (In re Merchant)*, 958 F.2d 738, 741

16  -- at page 741 (6th Cir. 1992).

17  In *In re Shojayi*, 515 BR 329, the bankruptcy

18  court in Kansas found that a deferred tuition payment

19  agreement was not an educational loan because the

20  contractual terms did not suggest the intent to create a

21  loan.

22  And in *In re Ray*, 262 BR 544, the bankruptcy

23  court for the Northern District of Oklahoma found that a

24  student account was not an educational loan because there

25  was no writing -- there was no written agreement

1   containing a liquidated sum that the debtor agreed to pay.

2          As I read the opinions of the Ninth Circuit BAP

3   and the aforementioned courts, a revolving credit account

4   with a school must be governed by a sufficiently

5   definitive -- definite loan instrument if the account is

6   to be accorded nondischargeable status.

7          Because 523(a)(8)(A)(i) requires a repayment

8   agreement, the first question confronting the Court is

9   whether the parties formed a contract governing Debtor's

10  payment obligations.

11         PSU relies on the school's revolving --

12  revolving charge account agreement, which it refers to as

13  RCAP.  But because PSU alleges the Debtor agreed to RCAP

14  as a part of the school's online registration process, the

15  mechanics of contract formation require some explanation.

16         Megan Looney, PSU's Assistant Director of

17  Student Financial Services, testified that to enroll,

18  students must assent to "terms and conditions of payment

19  enrollment," which I will refer to as the T&C, on the

20  University's website.

21         I find Ms. Looney's testimony credible that

22  Debtor agreed to the T&C online at various times.

23         But this is not the end of the inquiry, because

24  the T&C in itself does not contain the specific types of

25  repayment terms required for purposes of 523(a)(8).

Specifically, T&C does not contain an explicit promise to pay an amount of the principal balance of the student loan, or an explanation of how such balance is determined, an interest rate or a repayment term. Instead, the T&C essentially says that the student agrees that unpaid account balances will be governed by the -- by the RCAP. See Hearing Exhibit C.

The RCAP, which does contain the requisite payment details, was referenced and hyperlinked in the T&C webpage.

In itself, this is unremarkable. The T&C purports to incorporate the terms of the RCAP by reference, which is within PSU's rights. See *Garrett v. State Farm Mutual Insurance,* 112 Or App 539 at page 544 (1992), "When a written contract refers in specific terms to another writing, the other writing is part of the contract."

However, as the party seeking to enforce the alleged contract, PSU bears the burden of establishing the RCAP's existence and its terms. *Holdner v. Holdner*, 176 Or App 111 at page 120 (2001). This is where PSU encounters difficulty.

(A) Debtor accepts the RCAP in 2005. As previously noted, PSU provided testimony regarding its practices and procedures to ensure that students

1   periodically agree to the terms of the RCAP through the

2   T&C screen.  PSU produced evidence -- sufficient evidence

3   to prove that Debtor agreed to the RCAP on October 30th,

4   2005.

5          In response, Debtor spent considerable effort

6   pointing out that PSU produced two versions of the RCAP.

7   See Hearing Exhibits A and D.

8          The differences between these two documents are

9   trivial and non-substantive.

10         Neither side disputes that the RCAP was an

11  online agreement.  Accordingly, the terms of the contract

12  are stored electronically, and as PSU's witnesses

13  testified, the text is formatted differently in different

14  computer-generated reports.  This is neither surprising

15  nor legally significant.  I find that there's no material

16  difference between the two versions of the RCAP produced

17  by PSU.

18         Accordingly, any reference in this ruling to the

19  RCAP collectively encompasses both A and D.

20         One important provision contained in the RCAP

21  states, "This agreement will remain in effect as long as

22  my account has an outstanding balance."  Hearing Exhibit A

23  at 1.

24         As a general matter, parties are free to limit

25  the effectiveness of a contract to a defined period of

1    time.  Consistent with this general rule, Oregon law

2    recognizes the ability of parties to limit the duration of

3    their contractual relationship.  A specific provision

4    relating to the duration of a contract will govern over

5    more general language that could arguably imply an

6    indefinite contract.  *Deerfield Commodities v. Nerco,*

7    *Inc.,* 72 Or App 305 at page 319 (1985).

8         Although it is not generally relevant --

9    although it is not directly relevant here, Oregon courts

10   even recognize the ability of parties to impliedly limit

11   contract duration.  *Hampton Tree Farms v. Jewett*, 320 Or

12   599 at pages 614 and 615 (1995).

13        The Ninth Circuit has also recognized this facet

14   of Oregon law.  *Hoskie v. Santoro*, 199 WESTLAW 510804 at 1

15   (9th Cir. July 14, 1999) (unpublished).  An agreement to

16   pay commissions, "as long as defendant wrote personal

17   automobile insurance," was evidence that parties agreed to

18   limit the duration of their contract.

19        Here, the RCAP provides that the contract

20   terminates when a student account is paid in full.

21        Subsequent renewals.  Ms. Looney testified that

22   at several points in between 2005 and 2010, Debtor paid

23   his account -- his student account statement balance in

24   full.  See also, Hearing Exhibit M, Hearing Exhibit 26 at

25   4313-4520.

1        Thus, according to the contract, whenever Debtor

2  paid his account in full, the RCAP was no longer in

3  effect.  Seeming to anticipate this issue, PSU provided

4  evidence that it regularly requires students to reconfirm

5  their assent to the terms of the RCAP when enrolling for

6  subsequent academic periods.  Consistent with this policy,

7  PSU proved that Debtor specifically assented to the RCAP

8  at various times after October 30th, 2005.

9        Amendment of the RCAP.  At first glance, the

10  aforementioned facts seem to support PSU's case.  Debtor's

11  periodic assent to the RCAP would revive the parties'

12  contract each time Debtor enrolled in classes.  PSU's

13  position falters, however, because it admits that the

14  terms of the RCAP changed.  But PSU has not introduced the

15  modified text into evidence.  Specifically, Ms. Looney

16  testified that substant -- subsequently -- substantively,

17  the RCAP did not change until 2010.  Upon questioning from

18  me, Ms. Looney confirmed that the RCAP terms did indeed

19  change at an unspecified time in 2010.

20        "COURT:  I think you said that there were

21  amendments to the RCAP in 2010.

22        "LOONEY:  Correct.

23        "COURT:  So what changes were made and when were

24  they made?

25        "LOONEY:  I do not have that on me, but we have

1  on occasion updated that form.

2       "COURT:  So sometime in 2010 the form was
3  updated?

4       "LOONEY:  Yes."

5       Even though Ms. Looney testified that the Debtor
6  agreed to the T&C webpage in the fall of 2010, PSU did not
7  adequately prove the contents of the RCAP that was
8  purportedly incorporated by reference at that time.

9       The school admits that a different version of
10 the RCAP was implemented sometime in 2010, but the only
11 copy of the RCAP that PSU provided the Court stated that
12 it was electronically signed by the Debtor in 2005.

13      Accordingly, PSU has not carried its burden of
14 proof.

15      Moreover, because, as discussed earlier, a
16 nondischargeable student loan must be governed by a loan
17 instrument that meets certain standards, the contents of
18 such instrument becomes a factual question of independent
19 legal significance.

20      As a result, the best evidence rule requires
21 that PSU prove the contents of the RCAP by introducing a
22 copy of the agreement.  Federal Rule of Evidence 102 to
23 103 -- 1002 to 1003.

24      Because PSU did not provide a copy, it cannot as
25 a matter of law prove the contents, or by extension, the

1  existence of the alleged contract governing the extension

2  -- extension of credit for the fall 2010 term.  See

3  *Kenneth Broun, McCormick on Evidence* at § 234 (7th

4  edition) (revised 2016).

5       So, in conclusion, I find that PSU has not

6  carried its burden of proving the existence of a repayment

7  agreement governing Debtor's unpaid account balance.  For

8  that reason, the debt owed by Debtor to PSU was included

9  in Debtor's discharge, and need not reach the other issues

10 raised by the Debtor, including his argument that the loan

11 is nondischargeable because he did not actually receive a

12 benefit.

13      Because the parties have agreed to defer the

14 issue of contempt and damages, further briefing and

15 possibly an evidentiary hearing will be necessary to

16 resolve the Debtor's motion.

17      So, I don't know if the parties conducted

18 discovery on all the issues they need to do discovery on,

19 or whether we need more time for that, or what.

20      MR. FULLER:  We would need some more time,

21 Judge.

22      THE COURT:  All right.  So, this was pretty slim

23 -- narrow issue of law that you won on.  And I would not

24 take that as, "Oh, the Judge is going to grant me a huge

25 amount of money."  Right?

1          MR. FULLER:  We're waiting for prove-up so we

2    can explain to you the negotiations between us.

3          THE COURT:  Well --

4          MR. FULLER:  We are not being greedy, Judge,

5    trust me.

6          THE COURT:  Okay.  So, well, I mean,

7    negotiations between you are -- are privileged and don't

8    come in.

9          MR. FULLER:  On -- on fee prove-up, it'll be

10   relevant legally.

11         THE COURT:  Okay, well, we'll see.  So how long

12   do you think you'll need for -- it sounds like we'll need

13   two hearings.

14         MS. SINNOTT:  I --

15         MR. FULLER:  Given the holiday, I mean -- go

16   ahead.

17         MS. SINNOTT:  I am having eye surgery on

18   November 9th and won't be able to see for about three

19   weeks.  So that's going to be --

20         THE COURT:  Okay, I can --

21         MS. SINNOTT:  -- an issue.

22         THE COURT:  So sometime in January?

23         MS. SINNOTT:  That would be --

24         MR. FULLER:  We'd still like to go back to Judge

25   Dunn if -- I mean, if the other party -- the party and the

1  Court would be open to it.  We had about a 30 minute

2  settlement conference last time.  It was over --

3          MS. SINNOTT:  My client isn't here, so I can't

4  speak to that at this point.

5          THE COURT:  Well, I won't force you to, but I --

6          MS. SINNOTT:  I -- I'd like to get -- I mean, we

7  should just get the dates on the calendar, maybe, and then

8  -- right?

9          THE COURT:  Okay.  So, are we looking at January

10 then?

11         MS. SINNOTT:  January would be good.

12         THE COURT:  Okay.

13         THE CLERK:  How long do we need?

14         THE COURT:  Oh, half a day.

15         MR. FULLER:  Half a day.

16         THE CLERK:  For example, the first week, we are

17 open --

18         THE COURT:  No, go beyond the first week.

19         THE CLERK:  Okay.  All right.  How about --

20         THE COURT:  Oh, I actually have a 2017 calendar.

21 How about --

22         THE CLERK:  17th and 18th have nothing on them.

23         THE COURT:  Yeah, that's what I was thinking.

24 How about the 18th?

25         MS. SINNOTT:  I am out of town the 13th through

1   the 18th.

2            THE COURT:  Okay.

3            MS. SINNOTT:  And so maybe the week after that?

4            THE CLERK:  23rd or 25th are wide open at this

5   point.

6            THE COURT:  25th then?

7            MS. SINNOTT:  25th would be better.

8            THE CLERK:  Let's do it in the afternoon, maybe?

9            THE COURT:  It's a Wednesday, so whenever -- at

10  1:30, or?

11           THE CLERK:  1:30 I think would be better.

12           THE COURT:  All right.

13           MS. SINNOTT:  Did you say 10:30?

14           THE COURT:  1:30.

15           MS. SINNOTT:  1:30.

16           THE COURT:  Okay.

17           MR. FULLER:  Thank you, Judge.

18           (Adjourned)

19

20

21

22

23

24

25

# DECLARATION OF TRANSCRIBER

I, Robyn M. Anderson, hereby certify that:

a.   I am an Official Transcriber for the State of Oregon;

b.   that I personally transcribed the electronic recording of the proceedings had at the time and place herein before set forth;

c.   that the foregoing transcript totaling 16 pages of audio transcription, including cover pages and index, represent an accurate and complete transcription of the entire record of the proceedings, as requested, to the best of my belief and ability.

WITNESS my hand at Gresham, Oregon this 10th day of November, 2016.

_____
Robyn M. Anderson, Transcriber
robyntype@gmail.com
(503) 618-9938